# JANUARY TERM, 1859, AT LANSING.

## Matter of Henry Selby. Daniel S. Cash and Another, Appellants.

The act of Congress "for tho Relief of Citizens of Towns upon the Lands of the United States, under certain circumstances," approved May 23d, 1844, was intended to apply exclusively to actual and existing towns, and not to such lands as may have been selected by non-resident claimants as the site for a city or town.

Said act was intended for the protection of citizens of villages and cities that had grown, or might grow, up on government lands, for commercial and mechanical purposes, and to secure to them severally, at the minimum price, all lands actually occupied by them respectively for village or city purposes; and to them, collectively, for the use of the village or city, such other lands as might be embraced in the government subdivisions included within the limits of the village or city.

In providing that the trust under said act should be "conducted under such rules and regulations as may be prescribed by the legislative authority of the state or territory," said act intended to leave it with the local legislature to define and fix the limits and objects of the trust internally, and to carry out in detail what Congress had only given an outline of. Such rules and regulations are to relate to the determination of claims to possession, and the extent of possession that may fairly be considered as falling within an occupancy for town purposes, as well as to the disposition of the part of the land not actually occupied for town purposes by individuals.

The act of the Legislature of Michigan, approved February 29th, 1853, which authorized the district judge of the Upper Peninsula, after entering the lands embracing the town site of Ontonagon, to give "first to James K. Paul a deed of such lots as ho holds, or may hold, free from the claim of any other person, by virtue of an equitable pre-emption claim thereto, and to all other occupants, deeds to each severally of the lots held by them by virtue of contracts made with said James K. Paul,"—thus undertaking to dispose of the whole trust to the person named and his grantees, and authorizing no one else to be considered or receive any relief—is in direct violation of said act of Congress, and therefore void.

Said legislative act is inoperative and void also, because not prescribing any such rules and regulations for the execution of the trust as the act of Congress contemplates.

A claimant under said act of Congress, whose petition shows that the land claimed had not been actually occupied at the time the state legislation designed to carry out said act, was adopted, and that it was afterwards occupied only as a farm, does not come within the provisions of said act, and is entitled to no relief under the trust.

Where land has been entered by the county judge under said act of Congress, and the trustee is proceeding to adjudicate upon a claim made to a portion thereof, a person who sets up a right to such portion as a pre-emptioner for agricultural purposes, and claims that the same was never occupied for town purposes, and was not legitimately entered by the trustee, has a right to appear before the trustee, and be heard in opposition to such claim.

On the hearing by the county judge of a claim under said act of Congress, a citizen and tax-payer of the town, who objects that the claimant is not entitled to the land claimed, but that it is a part of the common fund to be disposed of for the benefit of the town, is entitled to appear and oppose such claim.

*Heard November 27th and 30th, and December 1st,* 1858.
*Decided January 11th,* 1859.

Appeals from the decision of the Honorable Daniel Goodwin, District Judge of the Upper Peninsula.

On the 20th day of June, A. D. 1857, Henry Selby presented his petition to said district judge, representing that he was equitably and legally entitled to the undivided one-half of lot six in section twenty-five within the limits of the town-site of Ontonagon, of which he was then in the actual occupancy and possession, as tenant in common with James K. Paul; that he acquired his right thereto by a quit-claim deed from said Paul, dated November 1st, 1856; that there was no other claimant or person in possession, claiming adverse to petitioner and said Paul; and he therefore asked that the said judge, as trustee under the act of the Legislature of Michigan, entitled "An Act to authorize the District Judge of the Upper Peninsula to hold in trust and convey Lands included in the Town-Site of the Village of Ontonagon, in the county of Ontonagon," approved January 29th, 1853, might examine into and allow his claim, and execute a deed of said premises to petitioner.

On a subsequent day to which the hearing of said petition had been continued, Daniel S. Cash appeared by attorney, and excepted to the jurisdiction of the district judge to proceed to adjudicate upon claims to lots, or other execution of the trust under the act of Congress of May 23d, 1844, on the ground that the Legislature had enacted no such rules and regulations for the execution of said trust as are contemplated by said act. This exception was overruled. He

also demurred to said petition on the ground that it did not show any such occupation and improvement, either by Paul or by Selby, as would give Selby any claim to said lot.

Selby thereupon filed an amended petition, setting forth, in addition to the facts before recited, that said lot contained 17 60-100ths acres; that petitioner took possession of the same in April, 1855, and built a house thereon, and cleared and fenced a portion thereof, and that he occupied the same, either actually with his family, or by having men in his employ cultivating and improving the same, until the autumn of 1856; that James K. Paul then claimed that said lot was part and parcel of the town-site of Ontonagon, and that he, said Paul, was entitled thereto, but offered to and did, in consideration of the occupation and improvements made by petitioner, and the equitable interest he had therein, deed to him the undivided half thereof; that since then petitioner and Paul have occupied said lot, and caused the same to be surveyed and laid out into lots for further improvement and sale; that, as petitioner believes, said lot had before then been surveyed and partially laid out into lots, and that it forms a part of the town-site of Ontonagon; that said subsequent survey alters the plan, and increases the number, of the lots in the subdivision simply for the purpose of having a correct survey thereof; that there is not, and never has been, any person occupying said lot but petitioner and said Paul, and no one claiming any adverse interest in, or to have occupied, said lot, except Daniel S. Cash, who claims an interest therein; and praying the allowance of his claim, and that a deed be made to him.

Cash answered the amended petition, denying that either Selby or Paul was ever an occupant of said lot within the meaning and intent of said act of Congress or of said act of the Legislature of Michigan; averring that said lot was never occupied by any person for the purposes of trade and not agriculture, or as any part of the town-site of Ontonagon, and setting forth facts to show that Selby had never

actually occupied said lot, and that Cash had a valid claim thereto as pre-emptioner.

Selby excepted to this answer: 1st, That it showed no right in Cash to appear as a contestant; 2d, That it presented no claim as a party in possession, occupant, or claimant, as applied to the town-site of Ontonagon; and taking also exceptions in matters of form. The first and second exceptions so taken were sustained, and Cash had leave to file an amended answer, but did not do so.

July 23d, 1857, Isaac C. Spalding appeared and filed his answer to the amended petition, excepting, as Cash had, to the jurisdiction; and, if the exception should be overruled, averring, to show his right to appear, that he was an occupant of the town-site of Ontonagon, and a tax-payer in the village of Ontonagon, and had had a claim awarded to him by said trustee, under said act of the Legislature; that a considerable portion of the lands described in said trust, and, among the rest, said lot six, were not, and never had been, occupied as any portion of said town-site by occupants within the meaning of the act of Congress; and claiming that under the trust such lands should be sold or otherwise disposed of for the benefit of all the occupants of said town-site. This answer, on motion of the claimant, the court set aside, the claimant was permitted to proceed *ex parte*, and on the 25th of July, 1857, a conveyance was awarded to him in accordance with the prayer of his petition.

Cash and Spalding appealed to this court.

*A. Pond, H. H. Emmons,* and *C. I. Walker,* for claimant:

1. The claim of Cash as pre-emptioner, is adverse not only to Selby, but also *to the title of the trustee himself.* If he had a pre-emption right to the premises, Goodwin should not, and, if the proper showing had been made, would not, have been permitted to enter the same.

The proper place for Cash to have preferred such a claim was to the Register and Receiver of the Land Office, and in

case they decided against him, to have appealed to the Secretary of the Interior.— 5 *Stat. at Large*, 455. If he did so prefer his claim, and a decision was given against him, that decision was final and conclusive, and, in the absence of fraud, or other causes such as would give jurisdiction to a court of equity, beyond review by this or any other court.— *Mitchell v. Cobb*, 13 *Ala.* 136; *Lewis v. Lewis*, 5 *Mo.* 183; *Jackson v. Wilcox*, 1 *Scam.* 344; *Wilcox v. Jackson*, 13 *Pet.* 511; *Strother v. Lucas*, 12 *Ibid.* 454. The presumption is that Cash did present his claim to the forum provided by Congress. If he did not present and prove it within the time allowed by the act, he lost all rights which he might otherwise have had under it.

But it is immaterial whether Cash did or did not have a valid claim as pre-emptioner. It is sufficient that the claim set up by him was beyond the jurisdiction of the trustee to act or adjudicate upon.

2. As to Spalding's claim of right to appear, we say: The act of Congress expressly provides, 1st, That the entry made by the trustee shall include only such land as is *actually occupied* by the town; 2d, That the trustee shall hold the land so settled and occupied, for the *several* use and benefit of the *occupants* thereof, according to their *respective* interests. And we submit that the word *occupied* must, necessarily, be given the same construction in both these provisions; that the words "several" and "respective" definitely fix its meaning in the latter; and, hence, that the proper forum, in permitting the trustee to enter the premises in ·controversy, has conclusively decided that the said premises are "actually occupied," as a part of the town-site, within the meaning of said act, and that the language of the act itself thus expressly excludes the idea of the trustee's holding any portion of the land for the *general benefit* of the community. He holds for the "*several* use and benefit of the occupants, according to their respective interests." Again: Spalding, by his petition, recognizes and relies upon the

validity of the act of the Legislature of January 29th, 1853 (having, as he shows, applied for and received from the trustee under said act a conveyance of certain premises included in said trust); and we insist that, by the terms of said act, his present claim is excluded.

3. The appellants being mere volunteers in these proceedings, and having no rights which the act of the Legislature complained of, whether valid or invalid, can in any wise affect, the question of the validity of said act can not properly arise or be considered here.

But we contend that that act is not in conflict with the act of Congress, and that it does prescribe rules and regulations for the execution of the trust, within the meaning of the act of Congress. We submit that the act of Congress clearly confers, and was intended to confer, upon the Legislature just the power it has assumed to exercise in the act in question. The language used—viz., "as to the disposal of the lots in such town, and of the proceeds of the sale thereof"—can have no other construction than the one given it by the Legislature.

It is admitted that the act of Congress does give the Legislature power of appropriation over the proceeds of sales of lots; that is, power to determine when, for what purposes, and in what manner, said proceeds shall be used. Now the same words which grant this power, grant also the power as to the disposal of the lots themselves. How, then, can it be construed to give them power of appropriation in the one case and not in the other?

The intention was to give, and the act of Congress does give, the Legislature power to determine generally the classes of persons entitled under the act, and to leave to the trustee the determining the several individuals belonging to such class, and the particular premises to which each individual might be entitled.

The Court can not presume that the Legislature have wrongfully or improperly exercised, or attempted to exercise,

the power thus given them; — in fact, the presumption is strongly the contrary. The history of the settlement of the town - site of Ontonagon, and the facts and circumstances relating thereto, which were undoubtedly before the Legislature at the time of the passage of the act in question, are not a part of the record in this cause. But we submit that, if facts and circumstances which would justify the act can be conceived as possible to exist, the Court are bound to presume that they did exist, and were before the Legislature at the time of the passage of this act. Such facts and circumstances are conceivable, and did actually exist, and were before the Legislature; and the validity of the act must be sustained.

*S. T. Douglass*, for appellants:

Under the act of Congress, so much of the lands conveyed as was occupied for town, and not for agricultural, purposes — that is, for the purposes of commerce, manufactures, residences, &c. — is held in trust "for the several use and benefit of the occupants thereof, according to their respective interests"; that is, according to their respective equitable claims, founded upon such actual occupation, use, and improvement. The act contemplates that the portion of the town - site to which each occupant shall be so equitably entitled, shall be ascertained, and, when ascertained, shall be conveyed to the occupant in fee.

As to so much of the land as was not actually occupied for town purposes, under this act, Judge Goodwin holds it in trust for the occupants of said town - site, as a community, for purposes analogous to those for which property is held by municipal corporations. The act contemplates that this portion of the lands will be eventually conveyed or appropriated for the benefit of that community.

The act does not give to the state Legislature any power whatever to change or modify the nature and objects of these trusts, or to provide for any disposition of the property dif-

ferent from that which the act contemplates. It only gives to the Legislature power to provide rules and regulations for the *execution* of the trust; that is, to provide by what tribunal, at what time, and in what manner of proceeding, the several rights of the occupants should be determined, &c., and how, when, &c., the unoccupied portions of the land should be disposed of, for the benefit of the occupants as a community.

The act of the Legislature contains no such rules and regulations as are contemplated by the act of Congress. Its material provisions (§2) are clearly designed for, and, if executed, they would accomplish the purpose, not of *executing*, but of *defeating*, the objects of the trust, and are therefore merely null and void.

Consequently, Judge Goodwin had no jurisdiction to proceed in the execution of the trust.

2. Cash and Spaulding were both improperly denied the right to appear and contest Selby's claim.

Cash had a right to defend, in virtue of his possession and claim of a right of pre-emption. The issuance of the patent to Goodwin determined nothing as to his right. — *Garland v. Wynn*, 20 *How.* 60. Cash's possession and claim of pre-emption gave him a right as against all the world, except the Government, or some person claiming a valid title under the Government; and he was entitled in virtue of that possession, &c., to resist the establishment of any claim under the Government. If Selby had no claim to the land, as an occupant within the true intent of the act of Congress, he was entitled to show it, and prevent an adjudication in Selby's favor, which would greatly embarrass the assertion of his pre-emption claim.

Spalding, though not individually a claimant of the land, in a strict sense of the word, as an occupant of the townsite, had, under our construction of the act of Congress, an interest in preventing any one from acquiring title as an occupant who was not entitled to it, because the unoccupied

portions of the land conveyed to Judge Goodwin would be held in trust for all the occupants as a community. He was one of the *cestuis que trust* for whom Judge Goodwin held the legal title.

3. Either Cash or Spaulding, if entitled to appear and contest Selby's claim, had of course a right to take this appeal, and is within the purview of sec. 3 of the act of the Legislature.

The proceedings before Judge Goodwin have but a remote analogy to a suit, either at law or in equity; and any attempt rigidly to apply to them rules applicable to such suits, can only lead to error.

CAMPBELL J. :

The district judge of the Upper Peninsula, on the 28th day of November, 1856, received a patent for lots 1, 2, 3, 4, 5, and 6, of section 25, and lot 1 in section 36, in township 52 north, of range 40 west, in Ontonagon county, in trust for the several use and benefit of the occupants thereof, according to their respective interests. This purported to be granted under the provisions of an act of Congress, approved May 23d, 1844, entitled "An Act for the Relief of Citizens of Towns upon the Lands of the United States, under certain circumstances." Lots 1, 2, and 3, in section 25, lie on the east side of Ontonagon River, and extend from its mouth to section 36. Lot 4, in section 25, is an island in the river, near its mouth. Lots 5 and 6, in section 25, are west of the river. Lot 1, in section 36, is on the east side of the river.

In pursuance of an act of the Legislature of this state, entitled "An Act to authorize the District Judge of the Upper Peninsula to hold in trust and convey Lands included in the Town-Site of the village of Ontonagon, in the county of Ontonagon," approved January 29th, 1853, the district judge, having obtained this patent, proceeded to act, and awarded lot 6, in section 25, to Henry Selby. Daniel S. Cash and

6 Mich. — O.

Isaac C. Spalding severally opposed Selby's claim, and severally appealed from its allowance.

An objection is made against the right of either Cash or Spalding to appeal from the decision of the trustee, based upon an alleged want of interest.

The consideration of this question renders it necessary to look into the legislation on this subject, to ascertain what rights are provided for and protected under the laws applicable to the case.

By the pre-emption law of 1841, no pre-emption could be made, by any individual, of any sections, or fractions of section, sincluded within the limits of any incorporated town, or which had been selected as the site for a city or town, or any parcel or lot of land actually settled and occupied for the purposes of trade and not agriculture. And by the act of 1844, above referred to, it is provided as follows:

"Whenever any portion of the surveyed public lands has been, or shall be, settled upon and occupied as a town-site, and therefore not subject to entry under the existing pre-emption laws, it shall be lawful, in case such town or place shall be incorporated, for the corporate authorities thereof, and, if not incorporated, for the judges of the county court for the county in which such town may be situated, to enter at the proper land office, and at the minimum price, the land so settled and occupied, in trust for the several use and benefit of the occupants thereof, according to their respective interests; the execution of which trust, as to the disposal of the lots in such town and the proceeds of the sales thereof, to be conducted under such rules and regulations as may be prescribed by the legislative authority of the state or territory in which the same is situated: *Provided*, That the entry of the land intended by this act, be made prior to the commencement of the public sale of the body of land in which it is included, and that the entry shall include only such land as is actually occupied by the town, and be made in conformity to the legal subdivisions of the

CASH AND SPALDING, APPELLANTS.

public lands authorized by the act of 24th April, 1820, and shall not in the whole exceed three hundred and twenty acres; and *Provided, also,* That any act of said trustees not made in conformity to the rules and regulations herein alluded to, shall be void and of none effect."

As the Indian title to the lands in question was not extinguished until 1842, none of the previous retrospective acts are applicable. The authority of the district judge to act as trustee, was not brought in question on the argument, and we shall not, therefore, inquire into it for the purposes of this investigation.

In order to understand fully the meaning of the act of 1844, it becomes necessary to examine, for a moment, into the rights in land as existing before that.

Agricultural pre-emptions were permitted, under very stringent provisions, confining the settlers to a *bona fide* occupation for agriculture alone. The lands in the excepted list were, for reasons of public policy, taken from the power of the agricultural settler; but no one else was, by the law of 1841, authorized to enter them; and under that law they still remained public property, subject to the action of Congress.

Individual rights were not recognized. The only authority in any one to enter such property existed in counties; which were authorized, by an act of 1824, to select one hundred and sixty acres for a county-site.—4 *Stat. U. S.* 50.

Inasmuch as, until the law of 1844 was passed, no other rights could intervene, it is necessary to see how an agricultural pre-emptioner could ascertain whether the property was subject to his entry or not; for, if not otherwise appropriated, he would clearly have a right to select it and improve it as agricultural land. If covered by an incorporated town, he would have notice of that; for no town ever becomes incorporated without inhabitants; and, if such a thing were imaginable, he would still have notice, for no town could become incorporated unless by proceedings under the

public laws. If actually occupied for trading purposes, there would be the same visible notice. But if any selection could exist not based on occupancy, no such notice could easily be obtained; for, inasmuch as the law does not pro-vide how or by whom such selection may be made, and gave no rights to any one under it, the agricultural pre-emptioner would not know where to look for information. But there are very serious difficulties in the way of allow-ing any *selection* by individuals, beyond their actual occu-pancy. The pre-emption law requires, whether the pre-emption be by one, or by two jointly, that the applicants shall make oath that the lands were settled upon and im-proved in good faith, to be appropriated to the exclusive use or benefit of the applicants, and not for purposes of speculation; and that no contract exists, directly or indi-rectly, with any other person, for a beneficial interest in it. It would be a singular construction to hold that an agri-cultural or other settler could evade these plain provisions, and claim a better right where he professedly enters land for speculation, and with the intention of selling it out to others, than where he in good faith observes the law. To hold that an agriculturist can be displaced for another indi-vidual, who may hold the entire tract for private purposes, would be to defeat the plain language of the statute. And until the law of 1844 was passed, there could be no pretense whatever in favor of any private claimant of an exclusive right. The law gave rights to no one.

The language of the act of 1844 is confined to lands actually settled and occupied. It has no reference to "se-lected" lands, unless the selection is included in the other language. The words "settle" and "occupy" do not first occur in this act — they are to be found in all the previ-ous pre-emption acts. — See *Brightly's Dig.* 469, *et seq.*, where the various acts are collected. They are inappli-cable to any other state of things than a *bona fide* use and improvement of the land. And not only is the land

to be entered by the county judges, required to be "*settled upon and occupied as a town-site*," but the specific trust is confined to the use and benefit of the occupants. It is claimed for the appellee, in this case, that one person may select one hundred and sixty acres, or two persons three hundred and twenty acres, as a town-site, and so appropriate the whole against all comers, and that the law protects them in such selection, and that the entry by the judges will enure to their benefit. But, if this is so, the language of the act is not well chosen to convey the idea. "Settlement" and "occupancy" are not such terms as convey this meaning; and the term "occupants," which embraces naturally all of a class, can not be confined to mean a small number, or an individual who may not be an occupant, in fact, at all. But a fatal objection to such a theory is to be found in the fact that the law does not compel the county judges to enter the lands at all; and not only provides no means of securing the property, if they refuse to act, but removes the right of preemption entirely, unless exercised before the public land sales.

It is impossible to harmonize such a law with any such rights as are set up, beyond rights of occupancy.  The decision of Secretary Thompson, upon the application of the county judge to enter certain lands laid out at Superior City, contains so clear an exposition of the law, that we refer to this part of his opinion at length. He says:

"The act of 23d May, 1844, entitled 'An Act for the relief of Citizens of Towns upon the Lands of the United States, under certain circumstances,' provides for the entry of any portion of the surveyed public lands, which has been, or may be, settled upon and occupied as a town-site.

"The title, as well as the words employed in the body of the act, clearly demonstrates that the same was intended to apply exclusively to actual and existing towns. It refers to, and recognizes, only such surveyed public lands as are settled upon and occupied as a town-site—not such as have been selected by non-resident proprietors or claimants, as the

site for a city or town, as exempt from entry under existing pre-emption laws. There is no provision made for filing notice of selection, and the act does not specify or contemplate any proceedings, whereby lands which have merely been so selected, shall be excluded from the operation of other pre-emption laws.

"Prior to the passage of this act of 23d May, 1844, it was the policy and settled practice of the Government to prohibit the sale or acquisition, by pre-emption, of lands which were occupied as town-sites or trading-places; the object of such prohibition being to secure the interests of the Government by the sale of the lands at their enhanced value, in such a manner as might be deemed best to effect that object.

"That clause in the act of 1841, which provides that no portions of the public lands which have been selected, as the site for a town, shall be liable to entry under and by virtue of its provisions, can not, therefore, be construed to recognize the right of selection, by individuals, of portions of the public lands for town-sites, for their own use and benefit, *since, at that time, the system of granting rights of pre-emption on lands of that character, had not only not been adopted, but was directly at variance with the established practice and policy. It was manifestly not the object of the law to withhold from pre-emption such lands as individuals might designate or select, without authority, as the site for a probable or prospective city or town. If so, it would have been within the power of any person or persons to defeat the pre-emption claims of those whom they were interested in opposing, by alleging that the particular land upon which such claimant had settled, had hitherto been so selected.*

"It was, then, not intended by said clause of the act of 1841 to withhold lands which might be regarded as eligible or adapted for town purposes, from pre-emption, until claimants should have an opportunity to make settlements and im-

provements, since, at that time, it was not to protect the interests or supposed rights of citizens of cities or towns that such lands were withheld and excluded from pre-emption; and therefore the supposition that said clause would recognize and protect, from the claims of others, such selections, is erroneous.

"The act of 23d May, 1844, further provides that the lands so settled upon and occupied shall be entered in trust for the several use and benefit of the occupants thereof. Referring to the title of the act, 'For the relief of Citizens of Towns,' &c., it may easily be determined that by the term 'occupants' is meant those who are settlers or residents, and that it only embraces the citizens thereof."

Although this decision conflicts with the opinion of Attorney-General Cushing, it conforms to the views of the land officers; and although none of these opinions are binding on the courts, yet we regard the views quoted as more in accordance with the plain language of the statutes than those expressed by Mr. Cushing. The law of 1844 was, we think, very clearly designed to protect *bona fide* town settlers, and did not recognize any paramount individual claims over them.

While the entry is only allowed to cover such land as is actually occupied by the settlers, it must nevertheless be made according to the government subdivisions, as the law does not permit these to be broken in upon. Thus, in most cases, some land would be found in each subdivision not actually built upon, or otherwise occupied for town purposes. These lands, the act clearly contemplates shall be sold; and the proceeds are to be disposed of under regulations to be adopted by the state legislatures, who are to establish rules and regulations for the whole execution of the trust.

Prior to any entry of the Ontonagon land in controversy, the Legislature of Michigan passed an act, approved January 29th, 1853, whereby the district judge was authorized to enter the several lots in section 25, including only so much

thereof as was actually within the town-site; and the trustee was directed to convey the lots, first, by granting to James K. Paul such lots as he might hold free from the claims of any other person, by virtue of an equitable preemption claim thereto, and to all other occupants such lots as they held by virtue of contracts with Paul. No other rules or regulations were made on the subject by the Legislature. On the 28th of November, 1856, a patent issued to Judge Goodwin.

The respondent, Henry Selby, at a session held by the trustee for that purpose, presented a claim to the undivided half of lot 6 in section 25, being an original government subdivision west of the river, containing 17 60-100ths acres. From Selby's petition it appears that he claimed to have entered upon this tract in April, 1855, and commenced cultivating and improving it; and that, in 1856, Paul claimed that it was a part of the town-site of Ontonagon, and that he, Paul, was entitled to it, having previously made a plan which covered this, as well as the land east of the river; and that he settled with Paul by taking a deed of an undivided half, on the 21st day of November, 1856, and that they had since jointly occupied it, and caused it to be laid out into lots for improvement and sale, and that no one else ever occupied any portion of the fraction, and that no one else but Daniel S. Cash claimed to have occupied it, or to have an interest in it.

Cash appeared to oppose this claim, alleging himself to be entitled to the lot as an agricultural pre-emptioner, and claiming that it never was occupied for purposes of trade, and never formed part of the town-site.

Spalding appeared, not as a claimant of this particular lot, but as an occupant of other property, within the act of Congress, and also of the act of the state Legislature, whose right had been confirmed by the trustee to such other property. He claims the right to appear on this account, and, as a tax-payer, to protect the property as legitimately belonging to the surplus fund.

Both objected to the right of the judge to proceed until the Legislature should have adopted proper rules and regulations, and both objected to Selby's claim as not within the law of Congress, and also denied its truth.

The district judge denied their right to oppose Selby's claim on the footing in which they appeared; and proceeded to adjudicate upon it, and allowed it.

It is claimed, on behalf of Mr. Selby, that neither of these contestants has any standing in court. Mr. Cash does not claim to have occupied the land as a trader, or as the inhabitant of a town; and his occupancy would not, therefore, come within the act of Congress. And if any portion of the subdivision had been occupied legitimately for town purposes in advance of him, he certainly could not prevail in an agricultural pre-emption.

But the law did not authorize the judge to enter any subdivision not settled and occupied as a town; and if this was not thus occupied, it was not withdrawn from private pre-emption. Any person claiming such pre-emption must have the right to oppose conflicting claimants. And if an unauthorized grant has been made of land to which he sets up a claim, we think it is his right to appear before any special tribunal undertaking to deal with the lands, to oppose any disposition of them calculated to create new rights, and increase the difficulties of defending himself. If the land was not legitimately entered by the trustee, it should not be disposed of to the prejudice of any just claimant. We express no opinion upon the validity of Mr. Cash's claim, but we think the nature of it sufficient to give him a standing in court.

The views we have already expressed, are decisive of the right of Spalding. While the act of Congress leaves the details of the use of the proceeds of the surplus fund to be regulated by the Legislature, it is very clear that the law designed that they should be used for the common benefit in some way. Many ways exist by which this end might be

attained. In the absence of any legal representative at least, we think any one interested had a perfect right to appear and protect the common fund.

Having a right to appear, are the objections raised such as to entitle them to a reversal of the action of the trustee?

It was never intended that the trustee should act, until provision had been made for such rules and regulations as would guide him in all his actions, and enable him to do full and complete justice. The views contained in the opinion of Judge Manning, render it unnecessary for us to go into more detail here. We agree entirely in all the main points of the case, and differ only as regards the right in court of Mr. Cash; and we adopt his reasons fully.

The first and most essential thing required, was the establishment of some tribunal where the rights of every one in the land in question could be investigated fairly. The Legislature, by the act of 1853, created the trustee a tribunal, but instead of empowering him to do impartial justice, undertook, by the act itself, to dispose substantially of the whole matter.

The whole tract is given to James K. Paul and his grantees. No one else was authorized to be considered, or to receive any relief. Instead of being calculated to carry out the design of the act of Congress, this extraordinary statute is in direct violation of it. The trust can not be legally carried out under such a law.

From the case made by Mr. Selby's petition, it appears that he has no rights except under this law. His petition shows that the land had not been actually occupied at all, until more than two years after the passage of the act of 1853, and was never occupied in fact, except by himself, and that only as a farm. If so, it formed no part of the town, and therefore could not enter into the trust. The deed from Paul was the only thing which could have given him any claim under the act of 1853. There is no evidence before us that he proved any thing beyond this deed. But

nothing which conformed to the allegations in his petition, could entitle him to any relief under the trust.

The decision of the district judge must be reversed, and the claim disallowed, and the proceedings annulled for want of jurisdiction in the judge to act.

CHRISTIANCY J. concurred.

MANNING J.:

Judge Goodwin held the land entered by him in pursuance of the act of the Legislature of 1853, and for which he afterwards obtained a patent, under the act of Congress of the 23d of May, 1844, "in trust for the several use and benefit of the occupants thereof, according to their respective interests; the execution of which trust, as to the disposal of the lots in such town, and the proceeds of the sale thereof, to be conducted under such rules and regulations as may be prescribed by the legislative authority of the state or territory," &c. Such is the language of the act of Congress under which the patent issued.

Whether the patent includes more land than would seem to be warranted by the act of Congress for the purpose contemplated; or whether the entry was "made in conformity to the legal subdivisions of the public lands authorized by the act," and the consequence of such variations from the act, if there be any, on the rights of third persons to any part of the land,—are questions not now before us, and on which I do not wish to be understood as having formed an opinion, one way or the other. For the purpose of the appeals to this court, I shall take it for granted the act of Congress has not been departed from.

Who are to be regarded as the beneficiaries of the trust, and what are their respective rights under it in the land taken for the town, and how are such rights to be determined, are questions difficult of solution. Within certain limits they are, I think, to be determined by the rules and

regulations to be prescribed by the local legislature mentioned in the trust.

The act of Congress, on which every thing that is to be done in the execution of the trust rests, and which must furnish a warrant for every thing that is done, it must be confessed, is vague and indefinite in most of its provisions, and particularly so, in regard to the details of the trust. Its language is, "for the several use and benefit of the occupants thereof [that is, of the town] according to their respective interests." If the act stopped here, it might with much plausibility be said, that every part of the town is to be deemed to be occupied by some one for town purposes, although parts of it, in fact, might be occupied for agricultural purposes only; and that such parts would, under the trust, belong to the several persons so occupying them. The fallacy of such a construction of this part of the trust is made manifest by the language that immediately follows: "The execution of which trust, as to the disposal of the lots in such town, and the proceeds of the sale thereof, to be conducted under such rules and regulations as may be prescribed by the legislative authority of the state or territory." It is evident from this, a sale or other disposition of portions of the town is to be made by the trustee. But how could this be, if the whole town is to be deemed in the occupancy of individuals? There would not, most certainly, in that case, be any lots for the trustee to sell or dispose of. By the word "*disposal*" I understand something else is meant than conveying to an occupant what he is entitled to under the preceding clause. It extends to the proceeds of the sale of lots as well as to the lots. And it is to be observed that, in this connection, nothing is said of occupants, or of their several or other interests in the lots, or in the proceeds of the sale of them. The word "*lots*" is not in the preceding clause, and as used here would seem to imply a previous platting or laying out of the town; it occurring here for the first and only time in the act. The

two clauses clearly have reference to different trusts. The first, a trust for the occupants of the town as individuals; the other a trust for them collectively as a community — as a corporation when the town is incorporated, or as a *quasi* corporation when it is not incorporated;—the act authorizing the corporate authorities to enter the land in the first case, and making them the trustees; and the judges of the county court to enter the land, and become the trustees, in the other.

The word "occupied" — "the land so settled and occupied, in trust," &c. — means here what is meant by the same word in the preceding part of the act; "occupied as a town-site." In both cases it is used in connection with the public, and means public occupancy, or an occupancy by the community, as such. And the word "occupants," immediately following "in trust for the several use and benefit of the occupants thereof," refers to individuals as such, and means individual occupancy. In the first sense, occupancy includes the whole town; in the other, it includes such part of the town only as is actually occupied by individuals for town purposes. At this point, the power of the Legislature commences, and is to be found in the words "to be conducted under such rules and regulations as may be prescribed by the legislative authority of the state or territory." By "rules and regulations," as here used, I understand something more than a mere mode of procedure, to be observed by the trustee in executing the trust. Congress may have intended this, but it seems to me the main, if not only, object Congress had in view was, to leave it with the state or territorial Legislature to define and fix the limits and objects of the trust internally, and to carry out in detail what Congress had only given an outline of.

My reasons for coming to this conclusion are:

1st. That the act of Congress does not define or mark out the line of demarcation between the two distinct trusts, already referred to — that is, to what extent individual

occupancy shall be permitted to displace public occupancy, or the occupancy of the community, as such. One of two things is certain: As this, as well as certain other things I shall advert to, is not done by the act of Congress, it must be done by local legislation, or be left to the discretion of the trustee; and there is nothing in the act from which such a power in the trustee can be inferred, and much to repel such an inference.

2d. That the act leaves it altogether to the local legislature (if the power be not in the trustee) to determine what disposition shall be made, within the objects of the trust, of town lots belonging to the community at large, and of the proceeds of such of them as may be sold. This part of the trust most clearly can not be executed without the intervention of local legislation. The trustee can not sell under the act, because it does not authorize him to sell any part of the trust property, or to make any disposition whatever of moneys that might come into his possession on such sale.

3d. Because the act provides that any act of the trustees, not made in conformity to such "rules and regulations," shall be void, and of no effect. And,

4th. Because it may reasonably be inferred from the whole act, that Congress intended, as the exigencies of different towns might and would greatly vary, to leave it with the local legislature to adapt the trust to such exigencies, for the reason that it could be better done by the local authorities, with the exigencies of the towns to guide and direct their action, than by any rules and regulations made by Congress, in advance, and before such exigencies had arisen. Most clearly, this was one object of the rules and regulations mentioned in the act.

It is not to be supposed that Congress intended, by the act of 1844, to encourage speculation in public lands, or to aid a few individuals in making a fortune out of them; but, on the contrary, as settlers on the public lands for agricul-

ture, had been, and were protected against speculators by pre-emption laws, that Congress intended, by this act, to extend the same protection to the citizens of villages and cities, that had grown, or might grow, up on government lands, for commercial and mechanical purposes, and to secure to them severally, at the minimum price, all the land actually occupied by them respectively, for city or village purposes, and to them collectively, for the use of the village or city, such other lands as might be included within the limits of the city or village. But suppose an individual should be in possession of ten or twenty acres of land, in connection with his residence, or place of business; is he to have the whole of it? Would the possession of so large a tract fairly come within an occupancy for town purposes? Again, a much larger piece of ground might fairly be considered as falling within an occupancy for town purposes, in a village with few inhabitants, than in a city with many. I think the rules and regulations to be made by the local legislature, are to have reference to the settlement of such questions, as well as to the disposition of the part of the town not actually occupied for town purposes by individuals. Shall the part not occupied be platted into lots, and be sold? Shall any of it be reserved for public buildings? For what public purpose shall the proceeds of sale be approriated? These, and the like, questions, are to be answered by local legislation.

The appeal of Cash should be dismissed, as he claims nothing under the trust. He says the land which Selby claims does not belong to the trustee, but to him, Cash. If this be so, he must establish his right to it before a proper tribunal. The trustee can not decide the question, or refuse, in consequence of such claim, to execute the trust.

Spalding's appeal rests on a different ground. He makes no individual claim to the land, but insists Selby has no right to it, under the trust, and that he, Spalding, as a member of the community, has a right to appear and oppose its allowance. The community of which the appellant is a

member, and which is interested in the trust, has no separate political existence, or legal organization, through which it can act, or assert its rights; and this, of itself, it appears to me, is a sufficient reason for permitting one of its members to appear on its behalf. It is necessary, to prevent a failure of justice. When the law recognizes a right, it will provide a remedy to enforce it.

By the act of January 29th, 1853, the Legislature, I think, failed to do what it should have done under the act of Congress, and did what it had no right to do. The act prescribes no rules or regulations, defining the extent of occupants' claims, or what land, occupancy for town purposes should include; and omits to make any disposition, by sale or otherwise, of the land not included in such claims. The Legislature also did what it had no right to do, in recognizing individual claims, not founded on occupancy for town purposes; as a right in James K. Paul to "a deed of such lots as he held, or might hold, free from the claim of any other person, by virtue of an equitable pre-emption claim thereto, and to all other occupants, deeds to each, severally, of the lots held by them, by virtue of contracts with said James K. Paul." In this, the Legislature acted outside of the trust, instead of confining itself to its details.

Selby's claim, as appears from his original and amended petition, is not based on occupancy for town purposes. It includes the one undivided half of seventeen and one-half acres of land, and is made under a deed from Paul, who claims the other half. And it is not made to secure to him his residence, or place of business, but for purposes of speculation; as is evident from that part of the amended petition which states that he and Paul "have caused the same to be surveyed, and laid out into lots, for further improvement and sale."

I think the allowance of Selby's claim by the trustee should be reversed, and held for naught.

MARTIN Ch. J. did not sit in this case.