CITY OF DENVER *v.* KENT et al.

TRUST — TOWN SITE — *under legislative control.* Under the act of congress of May 23, 1844 (5 Stat. at Large, 657), and the amendatory act of May 28, 1864 (13 Stat. at Large, 94), the execution of the trust is under the sole and exclusive direction of the legislative assembly.

TRUST — TOWN SITE — *who are beneficiaries.* Portions of the town site of Denver, not subject to individual claim, are held by the trustee for the use and benefit of the community at large.[*]

TRUST — *unauthorized sale by trustee.* A sale by the trustee of any portion of the town site of Denver, not according to the rules and regulations prescribed by the legislative assembly, is wholly unwarranted and absolutely void.

TRUST — *duty of trustee.* In the absence of authority to sell any portion of the town site of Denver, it was the duty of the trustee to await the action of the legislative assembly.

STATUTE — *repugnant to acts of congress.* Section 6 of the act of the assembly of 1866 (5 Sess. 88), by which unclaimed lots were granted to the city of Denver for the use of common schools, is repugnant to the acts of congress relating thereto and therefore void.

TRUST — *abuse by trustee — who may bring suit.* The city of Denver, in its corporate capacity, may institute and maintain suits to set aside sales of unclaimed lots made by the trustee of the town site of Denver, without authority of law, and may keep watch over the property until the legislature shall authorize the sale thereof.

TRUST — *town site — disposition of estate.* The legislative assembly has power to direct the sale of unclaimed lots in the city of Denver, and may apply the proceeds of such sales to the erection of public buildings for the use of the city, or for the support of its public schools, or any other general purpose that will conduce to the interests of the community.

BILL IN CHANCERY — *multifarious.* Several plaintiffs cannot demand by one bill several matters perfectly distinct and unconnected against one defendant, nor can one plaintiff demand several matters of different nature against several defendants.

*A bill to set aside and cancel several conveyances* alleged to have been fraudulently made to different parties at several times by the trustee of the town site of Denver, is multifarious and cannot be maintained.

### Appeal from District Court, Arapahoe County.

THE bill was filed by the city of Denver, as trustee for the use of common schools, against Omer O. Kent, probate judge, and a large number of persons, who, it was alleged, had obtained title to lots in the city of Denver. The several acts of congress and of the legislative assembly, relating to the matter of town sites, were referred to in the bill. It was alleged that James Hall was probate judge of the county of Arapahoe when the act of congress of 1864 was passed, and that he entered the lands mentioned in that act with the

---

[*]Appeal of D. R. Cash et al., 6 Michigan R. 193.

funds of the city and obtained title to the same; that the trust was not fully executed by him; that he was succeeded by Omer O. Kent, who proceeded in the execution of the trust until his term of office expired in September, 1867; that Jacob Downing then succeeded to the office and remained in office until the bill was filed in September, 1868; that about seven hundred and thirty-five lots have been wrongfully conveyed to persons having no right to the same; that these lots belonged to the city as trustee for common schools; that the probate court combined and confederated with the persons to whom such lots had been conveyed, to defraud the city and the common school fund of the proceeds of such lots; that many persons named as grantees in the conveyances made by the probate judge have no existence, and that such conveyances were made with intent to defraud the city and the common school fund.

Numerous conveyances alleged to have been fraudulently made were described in the bill. It was also alleged that a large number of lots, within the tract of land mentioned in the act of congress, had not been conveyed, and that the city of Denver was entitled to the same for the use and benefit of common schools; the prayer of the bill was that the several conveyances, made by the probate judge in fraud of the several acts of congress and of the legislative assembly, be declared void, and that the title of the city of Denver be perfected; that the probate judge be directed to convey to the city all lots so wrongfully disposed of, and all lots to which the city was entitled under the said acts, etc.

The bill was taken as confessed by some of the defendants and other defendants demurred. The district court sustained the demurrers and dismissed the bill.

Mr. ALFRED SAYRE, for appellant.

Messrs. CHARLES & ELBERT, for appellees.

Mr. Justice WELLS dissented.

BELFORD, J. The bill in this case was filed by the city of Denver, as trustee for the use of the common schools,

etc., against Omer O. Kent and others, to set aside and cancel a large number of deeds made by different probate judges to various persons. Separate demurrers were filed, assigning as grounds of demurrer :

First, that the complainant had no right to maintain the suit; and secondly, that the bill was multifarious. The demurrers were sustained, and this action of the court constitutes the error complained of.

The bill alleges that in 1865, James Hall, being probate judge of Arapahoe county, under and by virtue of an act of congress passed the previous year, entered a large tract of land that had been occupied as a town site by the citizens of Denver, and that he held that land in trust for such purposes. It is further alleged that he and his successors in office greatly abused their trust by making deeds of conveyance to numerous parties who were not entitled to receive them, and that, by reason of these fraudulent deeds, the community has been greatly injured. It further appears, that on the 9th day of February, 1866, the territorial legislature passed an act having direct reference to the disposition of certain portions of this land, and in which act it is provided that all lots and parts of lots in the city of Denver then held by Hall in trust by virtue of said act of congress, and to which there was no claimant, and to which no valid claim could be shown, should vest in the city of Denver for the use of the common schools of said city ; and that the city of Denver should have the power, by suit, in any court having competent jurisdiction, to secure and perfect the legal title to the same.

The bill prays that these fraudulent conveyances be set aside, and that the title of the city to the lots in controversy be established and quieted. On behalf of the appellees it is insisted that the city of Denver has no title ; that the act of the legislature was *ultra vires* and void, and that the claims of those now exercising ownership over these lots cannot be called in question. A correct decision of this case involves a review of the legislation of congress so far as the same is applicable to the entry of lands for town sites.

At an early period in our national history, it became the fixed policy of the government to aid in the settlement of the public domain. To this end, at various times laws were passed by which settlers upon such lands might, upon showing a compliance with certain prescribed rules, and for a small consideration, acquire the legal title to one hundred and sixty acres. These laws and rules, however, were only for the benefit of such persons as settled upon the public domain for agricultural purposes. In process of time settlements of widely different character were made. In eligible places large numbers of persons congregated, and towns and cities were built up. This kind of settlement was outside of the contemplation of the pre-emption laws, as they then existed, and it soon became a serious question how the title to this land so occupied should be secured. To meet this question congress passed the act of May 23, 1844, which provides:

That whenever any portion of the surveyed public lands has been or shall be settled upon and occupied as a town site, and therefore not subject to entry under the existing pre-emption laws, it shall be lawful, in case such town or place shall be incorporated, for the corporate authorities thereof, and if not incorporated, the judges of the county court of the county in which such town may be situated, to enter at the proper land office, and at the minimum price, the lands so settled and occupied, in trust for the several use and benefit of the occupants thereof, according to their respective interests.   *   *   *   The execution of which trust, as to the disposal of the lots in such town, and the proceeds of the sales thereof, to be conducted under such rules and regulations as may be provided by the legislative authority of the State or territory in which the same is situated: Provided, that the entry of the land intended by this act be made prior to the commencement of the public sale of the body of land in which it is included, and that the entry shall include only such land as is already occupied by the town, and be made in conformity to the legal

subdivision of the public lands authorized by the acts of the 24th of April, 1820.        *        *        *

And provided further, that any act of said trustees, not made in conformity to the rules and regulations herein alluded to, shall be void and of no effect." Under the terms and provisions of this law, the lands embraced in many town sites that had been theretofore settled, and of many towns subsequently settled and occupied, were conveyed to the proper and rightful occupants thereof. In the year 1859, a large number of persons associated together, under the name of the Denver Town Company, and took possession of a portion of the public domain now known as the city of Denver, which they surveyed and laid off into streets, alleys, blocks and lots, and which they commenced to improve as a town, by the erection of dwelling-houses, stores and offices. When the lands on which this city was built became surveyed, and the lots and buildings acquired value, the owners became anxious for a title. The laws of 1844 limited the entry for town purposes to three hundred and twenty acres, and the city of Denver covered more than a thousand; so that there was no law by which a proper title to this land could be made to the men who were the occupants of the same, and the owners of the improvements thereon. To remedy this difficulty congress was applied to, and in response to this application passed the act May 28, 1864, which provides :

"That the provisions of an act of congress entitled 'an act for the relief of the citizens of towns upon the land of the United States, under certain circumstances, approved May 23, 1844,' be so extended as to authorize the probate judge of Arapahoe county, in the territory of Colorado, to enter at the minimum price in trust for the several use and benefit of the rightful occupants of said land and the *bona fide* owners of the improvements thereon, according to their respective interests, the following subdivisions of land, or such portions thereof as are settled and actually occupied for town purposes by the town of Denver aforesaid, to wit: Section number 33, and the west half of section number 34,

in township number 3 south of range number 68, west of.
the sixth principal meridian.   That in all respects, except
as herein modified, the execution of the foregoing provis-
ions. shall be controlled by the provisions of said act of
the 23d of May, 1844, and the rules and regulations of
the commissioner of the · general land office.''   From an
examination of these two acts it will be observed that the
power of the '' corporate authorities '' mentioned in the law
of 1844, and the probate judge in that of 1864, is limited to
the act of entry, and when the land is entered the party or
parties so entering it become invested with a trust, the exe-
cution of which is under the sole and exclusive direction of
the local legislature.   Until the legislature points out the
method and prescribes the rules of procedure, the trustees
are wholly incapable of conveying the legal title to the
beneficiaries of the trust, or of disposing of the land for
any purpose, or to any person.   But what is the character
of this trust ?   It will be observed that, while the entry under
the act of 1844 is only allowed to cover such land as is
actually occupied by the settlers, it must nevertheless be
made according to government subdivisions, as the law does
not permit them to be broken in upon.   Under this rule
some land would be found in each subdivision not actually
built upon or otherwise occupied for town purposes.   What,
then, is to be done with this land not occupied or improved ?
To whom is it to go ?   Clearly not to general government,
for its title has ceased by the issuing of the patent.   Not to
the territory, for it never had any interest.   Not to the
trustee, for he is a mere conduit or channel through which
the title passes from the government to the *cestuis que trust.*
Not to the individual citizen, for the act of congress defines
the extent of his individual interest.   The trust is mani-
festly a double one.   The first, a trust for the occupants of the
town as individuals ; the other, a trust for them collectively,
as a community ; the act authorizing the corporate author-
ities to enter the land in the first case, and making them
trustees, and the judge of the probate court to enter the
land and become the trustee in the other.   If we pass from

the law of 1844 to that of 1864, we find that the land to be entered is designated by sections and subdivisions, and we encounter the same question :   What becomes of the land not occupied and covered with improvements?   And to this question we are forced to answer that the probate judge holds it in trust for the community.   In neither of the laws does congress attempt to define or mark out the line that distinguishes the individual from the public trust; that is, to what extent individual occupancy shall be permitted to displace public occupancy or the occupancy of the community as such.   This whole matter is left to the local legislature.   To it belongs the creation of the tribunal before whom individual rights shall be adjudicated.   It prescribes the kind of evidence necessary to make good a claim of title. It prescribes what kind of disposition shall be made of the money arising from the sale of lots, and, in fact, has full and plenary power over the whole subject-matter of the trust, and to strengthen this power conferred by congress the law declares that any act done by the trustee, inconsistent with or in violation of the rules and regulations prescribed by the legislature for the execution of the trust, shall be void and of none effect.   Congress seems to have contented itself with declaring simply who might enter the land and denominating the *cestuis que trust*, all else it hands over to the territorial legislature, which is better fitted, on account of its proximity to the subject-matter of the trust, to supervise and direct its details.   There can be but little difficulty in comprehending the whole subject if we keep steadily in view the object had in the passage of the acts, namely :  **To** extend protection to citizens of the towns and cities that had grown up on the government lands for commercial and mechanical purposes, and to secure to them severally, at the minimum price, all land actually occupied by them respectively for city or town purposes, and to them collectively such other lands as might be included within the limits of the town or city.

Before the rights of the individual claimants could be fully secured it became the duty of the legislature to pre-

scribe the rules and regulations which would not only put
the trustee in motion, but define the manner and extent of
his action.   This it did.   It pointed out the method in
which the trust as to these parties should be executed.   It
prescribed what steps should be taken to secure their legal
titles, and empowered the probate judge or trustees to make
conveyances to those justly and rightfully entitled to re-
ceive them.   These rules and regulations were imperative
upon him.   They were the charter of his power and could
not be disregarded.   What they authorized, he could do,
and beyond them he could take no step.   By an oversight,
the legislature made no provision for the disposition of por-
tions of this land to which no individual claim existed,
and there is nothing in either act of congress from which a
power of sale in the trustee can be inferred, and much to
repel such an inference.   The acts of congress leave it alto-
gether to the territorial legislature to determine what dis-
position shall be made within the objects of the trust of
town lots belonging to the community at large, and of the
proceeds of such of them as may be sold.   This part of the
trust most clearly cannot be executed without the inter-
vention of local legislation.

The trustee cannot sell under the acts of congress,
because they do not authorize him to sell any portion of
the trust property, or to make any disposition whatever of
moneys that might come into his possession on such sale.
It being evident that it was the intent of congress that the
lands included within the town site, and to which no right-
ful claim exists on the part of any individual, should be
sold and the proceeds disposed of under the directions pre-
scribed by the legislature, who are to establish rules and
regulations for the whole execution of the trust, and it
being further evident that the legislature failed to provide
for the disposition of the same, it is clear to us that any
sale of such land, made by the probate judge or trustee, in
the absence of these rules and regulations, was wholly
unwarranted, and absolutely void.   It was an exercise of
power of which he was not possessed.   It was entirely

competent for him to make conveyances to those having a valid and rightful claim to land at the date of the entry, provided they furnished the proper and requisite proof—beyond this, his acts were *ultra vires*, and could in no manner affect the rights of the community. It was his duty to await the action of the legislature. Section 6 of the act of February 9, 1866, does not provide for a sale of this land, but affects to give the lots to the city of Denver, and is, therefore, void.

But, notwithstanding this fact, we are clearly of the opinion that if the probate judge made sales of these lands, it is competent for the city of Denver, in its corporate authority, standing as the guardian of the interests of the community within the limits, to institute and maintain suits to have such sales set aside, and conveyances canceled, and to keep watch over this property until such time as the legislature shall authorize the sale, and when sold it is competent for the legislature to order that the money arising therefrom shall be applied to the erection of public buildings, for the use of said city, or be appropriated for the support of its public schools, or any other general purpose that will conduce to the interests of the community.

While we are thus clear that the city of Denver is entitled to relief, another question remains, namely, whether it must seek it by separate suits against each individual implicated in the transactions, or whether it is at liberty to bring them all into court at one time. The bill in this case charges that the conveyances which are sought to be set aside were made by different probate judges, at different times, and to numerous persons, and it is, therefore, claimed by the appellees that the bill is multifarious. In the case of *Salvidge* v. *Hode*, 5 Maddock's Ch. 94, the vice-chancellor says: "In order to determine whether a suit is multifarious, or, in other words, contains distinct matters, the inquiry is not whether the plaintiff's bill seeks relief in respect of matters which are in their nature separate and distinct. If the object of the bill be single, but it happens that different persons have separate interests in distinct questions, which

arise out of that single object, it necessarily follows that such different persons must be brought before the court, in order that the suit may conclude the whole subject." The case of *Brooks* v. *Lord Whitworth et al.* was a case where an estate was put up and sold in several lots, and the bill was filed against various purchasers, six in number, praying that an account might be taken, and that the sales to the purchasers might be completed, and the remainder of the purchase-money paid in. To this bill a demurrer was filed, charging that it contained several and distinct matters that had no relation to each other, and in the greater part of which the defendant was in no way interested, and ought not to have been implicated. In deciding upon this demurrer the vice-chancellor says: "The court is always averse to a multiplicity of suits; but certainly a defendant has a right to insist that he is not bound to answer a bill containing several distinct and separate matters relating to individuals with whom he has no concern. A decisive objection to the bill is that the purchases of the different lots were made by distinct persons, each agreement being separate and distinct. The circumstances attending the sale of one lot may be very different from those relating to other lots. One may have objections, another has not." 1 Maddock's Ch. 58. In the case of *Rayner* v. *Julian*, 2 Dickens, 677, the bill was demurred to on the ground that it was multifarious. Lord KENYON says: "Suppose an estate is sold to different persons, a plaintiff could not include them all in one bill for specific performance; for each party's case would be distinct, and would depend upon its own peculiar circumstances, and there must have been a distinct bill upon each contract." See, also, *West* v. *Randall et al.*, 2 Mason, 200. We cannot see why a different rule should apply in this case.

We are aware that it is a favorite object with courts of equity to prevent multiplicity of suits. For this purpose it is a general rule in chancery that all persons materially interested must be made parties; the forms of proceeding in chancery and the power of the court to mold its decrees,

so as to suit the various equities of the case as established by the proof, enable it advantageously to settle and adjust in a single suit, rights and interests which, according to the rules of pleading in the courts of common law, would necessarily result in various issues incapable of being tried in a single case and disposed of by a single judgment. But, notwithstanding this disposition of a court of equity to prevent the multiplication of suits, it will not permit several plaintiffs to demand by one bill several matters perfectly distinct and' unconnected against one defendant, nor one plaintiff to demand several matters of different natures against several defendants ; and the reason of the rule is said to be that such a proceeding would tend to load each defendant with an unnecessary burden of costs, by swelling the pleadings with a statement of the several claims against the other defendants with which he has no connection, and also to prevent confusion and to preserve some analogy to the comparative simplicity of declarations at common law. See *Fellows* v. *Fellows*, 4 Cowen, 680.

We see no error in the action of the court in sustaining the demurrers to this bill, on the ground that the same was multifarious ; we have not considered whether an absolute dismissal of the bill may prejudice the right of the city to institute another suit, but, to save all questions of that nature, we reverse the decree of the district court and direct that court to enter a new decree dismissing the bill without prejudice to the rights of the complainant therein, this, of course, without costs.

WELLS, J., dissenting.    I think the complainant's bill shows no equity, and that the decree of peremptory dismissal, given in the district court, ought to be affirmed.

The question turns upon the construction to be given to the act of May 23, 1844, and as this case is one of great importance, I shall briefly set forth the reasons which compel me to differ from the other members of the court.

No bill in regard to the subject-matter of this action will lie at the suit of the present complainant, unless by the act

of congress a trust was created in some portion of the town site for the citizens of Denver as a community; or unless the legislature are by that act authorized to create such a trust.

I think that neither of these positions can be maintained.

The act of May 23, 1844 (5 Stats. at Large, 657), was intended to supply a defect in existing pre-emption laws. It is part of a system. It declares, in the opening clause, that, because lands settled upon as a town site are not subject to entry under existing pre-emption laws, therefore this legislation; it must therefore be supposed to have been inspired by the same reasons of policy, as the several preceding acts in addition and supplement to which it was enacted, that is to say, to encourage actual settlement in the public domain, and it ought not to be taken by intendment that the purpose of congress was to encourage or permit speculation in town sites, or to give special bounties to a few; or to so provide, that a few or many speculators might engross great tracts of the public domain, the prospective centers of population, which before that act were the common property of all citizens of the United States. The consequences here alluded to are, I think, the legitimate and almost necessary result of the doctrine of the majority opinion in this case; for, as I understand that opinion, the first ten men, or a less number, who settle at a frontier post may engross the whole of three hundred and twenty contiguous acres : so much as they severally occupy they may procure to be conveyed to them in severalty, and the residue which no one occupies and in which but for this enactment certainly no one of them, nor all of them collectively, would have any right whatever, is to be sold for their benefit, and they themselves may become the purchasers at nominal prices.

It is not certain of course, that such an abuse of the supposed donation will in any case occur; but it will be exceedingly probable in every case, and the more certain the future of the particular location and the greater the necessity and the propriety that it should not be engrossed

by a few for purposes of speculation, the greater is the probability that it will be.

Before I can accede to the doctrine that it was the intent of congress to create a trust so liable to fraud and abuses, and so contrary in its probable results to the spirit of all prior legislation, I must find a clear warrant for it in the words of the act, and I think the words of the act admit of no such interpretation.

The act declares that the entry of the town site shall be made "in trust for the *several* use and benefit of the *occupants thereof according to their respective interests.*"

Now, when ten or twenty or more families or individuals congregate and so form what is termed a town or vill, there is always an occupation of lands in severalty by each of the community ; this is the usage of our race. Generally, I believe, at least in the west, a survey into lots and blocks has preceded or shortly followed the first settlement, in order to precisely mark out and ascertain the bounds and extent of the right and possession of each individual settler, but whether there be such survey or not, I think it may be said invariably, the right and occupation of each settler has been wholly several and separate ; there are no common fields as with the early settlers of French and Spanish extraction, but they hold their lands like their goods, each his own, to and for himself.

This habit and usage of severalty in the occupation and ownership of lands was certainly within the knowledge of congress, and from the language used may be inferred to have been in contemplation in the passage of this act; and it was, I think, the several and separate occupancies of the individual settlers, which it was intended to protect and secure.

Nor do I think, that it was the intent of the act to extend its benefits beyond this ; for beyond those separate lots and parcels which come within the several occupancy of the individual settlers, every thing is vacant ; it cannot be fairly said that, in such case, the community collectively occupy the whole of the town site. An invading army are said to

occupy the towns and cities of the nation invaded, and each individual settler or inhabitant of the town occupies his own close and premises ; but if this word is ever used to express the residence of the whole population of a town upon the several quarter sections of land upon which it is built, this is not the common and ordinary use of the word, and it is the common and ordinary sense in which the words of the statute are to be received. But the statute limits the trust estate to the several use and benefit of the occupants, according to their respective interests ; beyond the several occupation of the individual settlers as before shown, there is no occupation, and beyond this, no settler has any interest whatever.

It follows then, that, except as to those lots which are actually occupied at the date of the entry, the trust does not then inure. But there is no provision that the land shall revert, nor certainly can the trustee hold it discharged of the trust ; the result is, that the trust remains in abeyance until, by subsequent occupations from time to time, the beneficiaries are appointed.

But, in the clause of the act which follows what I have already quoted, it is provided that the execution of the trust "as to the disposal of the lots in such town, and the proceeds of the sales thereof to be conducted under such rules and regulations as may be prescribed by the legislative authority of the State or territory," etc.

It is thought that by these words it was contemplated that some portions of the domain shall be sold, and the argument is, that there can be no sale of the occupied lots ; that, as to them, the sole duty of the trustee is to convey to the several occupants ; that whatever is implied from the words now under consideration, must therefore apply to the unoccupied portions only, and herefrom is deduced a power and duty in the local legislature to direct a sale of these portions, and prescribe the manner of it and the disposition of the proceeds which it is said may be appropriated to any public uses in their discretion.

The reasons which compel me to dissent from these conclusions are, briefly, as follows :

The clause of the act now under consideration relates to a matter merely incidental and subordinate to what precedes it. In what precedes this clause, as I have attempted to show, the trust estate is granted, and the trustee and the beneficiaries are appointed, and the several interests of the latter are fixed and determined. What follows relates merely to the execution of the trust ; and I take it to be a rule of construction that, where, by statute, a particular thing is clearly granted, and other words follow regulating the mere incidents of the principal thing, such as time, place, manner, etc., the latter word shall not have the effect to ·enlarge or limit what is before granted or prescribed, unless this is necessary to give them effect.

Is it necessary, in order to give effect to this latter clause, to say that there should be a sale of some portion of the several lots within the location ? I think not. In order to every entry of a town site under this act, the minimum price for the lands must first be paid by the trustee, either of his own moneys, or by provision of the State or territorial authorities, or of the citizens of the town or some of them ; these moneys, at least it will be agreed, the local legislature may require the occupant to pay to the trustee before he shall be entitled to receive a conveyance ; and this is the price which each occupant pays for his several interest and portion. The transaction may, I think, be fairly enough termed a sale, and the moneys paid by the settler to the trustee the proceeds of such sale. Unless the trustee had advanced his own moneys, legislation would be necessary to insure the proper disposition of the proceeds in his hands, and this is, I think, what was intended by the words in question. If, however, I am in error as to the construction to be placed upon these latter words—if it was contemplated that, under the act, there must be a sale of all lots which might in any particular case be unoccupied at the date of the entry— then I am clearly of the opinion that the proceeds must be divided among those who were occupants at the date of the

entry (or possibly at the inception of the proceedings for entry), and that no other persons are, or can become, entitled to share therein, for the trust is expressly declared to be for the "several use and benefit of the occupants," and there is no syllable in the act which negatives or qualifies this intention, or gives color to the idea that a joint use was intended either in the lands or their proceeds.

The city of Denver, therefore, has no interest whatever in these lots or their proceeds, and can have none by any legislation of the territory, for this would be to create a joint use where the statute has prescribed a several one, and a use not alone to the occupants at the date of entry (who, according to the majority opinion in this case, are the sole beneficiaries), but to them and to all who may come after them to the end of time.

I dissent, therefore, from the reasoning of the court, and from so much of the order as directs a modification of the decree which was given in the court below.

*Reversed.*