[Civil No. 743.    Filed March 20, 1901.]

[64 Pac. 445.]

In the Matter of the Application of GEORGE MARTIN, Petitioner and Appellant, v. GUST. A. HOFF, Mayor of the City of Tucson, Arizona, Respondent and Appellee.

1. PUBLIC LANDS—TOWN-SITES—TRUSTEE—AUTHORITY TO DISPOSE OF UNOCCUPIED LOTS—WHENCE DERIVED—REV. STATS. U. S., SEC. 2387, COMP. LAWS ARIZ. 1871, SEC. 3, AND REV. STATS. ARIZ. 1887, TITLE 9, CHAP. 2, SECS. 1, 22, CONSTRUED—CLARK v. TITUS, 2 ARIZ. 122, 21 PAC. 818, FOLLOWED.—The Revised Statutes of the United States (Sec. 2387, *supra*) provides that certain officers may enter at the proper land office land settled and occupied as a town-site, in trust for the several use and benefit of the occupants thereof, the execution of said trust as to the disposal and sale of lots in said town, and of the proceeds thereof to be regulated by the legislature of the territory or state in which the same may be situated. The Compiled Laws of Arizona of 1871 (chap. 89, sec. 3), in force when the entry of the town-site of Tucson was made, provides that it shall be the duty of the party entering such town-site "to convey the same to the occupants and inhabitants thereof, according to their respective interests, in the manner hereinafter described." The Revised Statutes of Arizona of 1887,

*supra,* provides that whenever three or more citizens of a town located, or that may hereafter be located, on public lands request the proper authorities in writing, such authorities shall enter so much of the land under the act of Congress, *supra,* as is necessary for town purposes. Section 22, *supra,* provides that the lots undisposed of, the title to which remains in the trustee, shall be subject to entry and purchase from the trustee. *Held,* that *mandamus* will not lie to compel the trustee to transfer certain lots to petitioner under the provisions of Revised Statutes of Arizona of 1887, *supra,* inasmuch as the Compiled Laws of 1871, *supra,* controls the disposal of lots in Tucson.

APPEAL from a judgment of the District Court of the First Judicial District in and for the County of Cochise. George R. Davis, Judge. Affirmed.

Herring & Mitchell, J. A. Zabriskie, and S. W. Purcell, for Appellant.

Rochester Ford, for Appellee.

STREET, C. J.—George Martin filed his petition in the district court of Pima County asking for a writ of *mandamus* directed to Gust. A. Hoff, mayor of the city of Tucson, trustee. The petition, summarized, is as follows: That Martin is a citizen of the United States, and a resident of Tucson, Arizona, and has been for ten years last past; that Gust. A. Hoff resides in said city, and is mayor thereof; that on the 1st of July, 1874, sections 12 and 13, in township 14 south, range 13 east, Gila and Salt River meridian, were granted and conveyed by the United States of America to Sidney R. De Long, mayor of the then village, now city, of Tucson, to him and his successors, in trust for the several use and benefit of the occupants thereof according to their respective interests, the same being in pursuance of the act of Congress (chap. 8, tit. 32, Rev. Stats. U. S.); that Hoff, as mayor, is successor in trust and holder of the legal title to the undisposed-of lands contained in said conveyance; that the legislature of Arizona, on the 10th of March, 1887, passed an act in relation to town-sites, being title 9, chapter 2, Revised Statutes of Arizona; that it is made the duty of Hoff, as successor to De Long and trustee, to execute deeds of conveyance of lots in said town-site to the occupants who have complied with the provisions of the said statutes and who

desire to become purchasers thereof; that on the first day of March, 1900, petitioner, Martin, under the provisions of said act of Congress and said act of the Arizona legislature, did enter upon, possess, and occupy lot 2 of block 257 of undisposed-of lands in said sections 12 and 13, describing it by metes and bounds, as it was marked and designated on a map and plat made by S. W. Foreman, and first adopted by the village of Tucson June 22, 1872, and again adopted by the city of Tucson on the 4th of December, 1899, being a part of the ground marked on the map "Occupied by the Military"; that the petitioner has erected substantial improvements on the lot, and has demanded in writing a deed of conveyance from said Hoff, mayor and trustee, as aforesaid, marked as an exhibit, and made a part of the petition, at which time he tendered forty dollars, purchase price of said lot, and five dollars for fee of trustee for filing and recording, and five dollars for acknowledging the deed; that he offered to make payment of any further required amount upon the delivery of the deed; said lot containing 12,295 square feet; that said Hoff had failed and refused to execute a deed therefor to the petitioner, and petitioner has no plain, speedy, and adequate remedy in the ordinary course of law, and prays for a writ of *mandamus* directed to said Hoff, mayor of the city of Tucson and trustee as aforesaid, demanding him to convey to the petitioner said lot. Further facts appearing from the exhibit filed with the petition and made a part thereof are: That said land, or a part of it, was first temporarily used by the military, and was so used at the time of the original survey of the city of Tucson, approved by the mayor and common council on June 26, 1872, of the then village of Tucson, and that the use by the military ceased on or about the year 1875, and that said land has had no occupant since that time, and was vacant and undisposed of from that time until the petitioner occupied it as aforesaid; that the said lot remains undisposed of, and the title of the same remains in the trustee, and the application of petitioner was made under and by virtue of the act of Congress (tit. 32, chap. 8, Rev. Stats. U. S.), and under and by virtue of the act of the legislature of Arizona (tit. 9, chap. 2, Rev. Stats. Ariz.), entitled "Town-sites." To this petition the respondent filed a demurrer, for that it did not

state facts sufficient to constitute a cause of action or to entitle the petitioner to the relief asked for. The demurrer was sustained by the court. Petitioner elected to stand upon his petition, and refused to amend the same, whereupon the court rendered judgment dismissing the petition. From that judgment petitioner appealed to this court.

The only error assigned relates to the order sustaining the demurrer and the judgment dismissing the petition. The petitioner seeks to obtain title to the lot in question by virtue of the acts of Congress and an act of the territorial legislature. Title 9, chapter 2, of the Revised Statutes of Arizona (par. 167) provides: ''Whenever the citizens of any town located or that may be hereafter located upon the public lands of the United States, if the inhabitants of such town shall be incorporated, it shall be the duty of the corporate authorities thereof . . . to enter so much of the land under the act of Congress entitled 'An act for the relief of the inhabitants of cities and towns upon the public land,' approved March 2, 1867, to which the town is entitled, as is necessary for its purposes.'' Paragraph 188 of said act provides: ''The lots undisposed of as aforesaid, the title to which remains in the trustee, shall be subject to entry and purchase from the trustee at the rate of ten dollars per lot.'' Paragraph 191 of said act provides that, whenever the term of office of the officer making such entry of a town-site has expired, he shall turn over to his successor in office all books, papers, moneys, accounts, etc., and thereafter such trust shall be discharged in every particular by such successor in office. It is contended by respondent that said act has no application to entries made prior to 1887, and that, as it appears from the petition the entry of the Tucson town-site was made long before its passage, the petitioner cannot obtain title to his lot under such act. Some argument has surrounded the terms ''located or that may be hereafter located,'' in which the petitioner insists that the word ''located'' has reference to all town-sites established before the passage of the act. In our judgment, the word ''located'' is not the pivotal term, but that the word ''enter'' is the term which must determine to what lands the provisions of the act are applicable. The plain reading of the act is that some officer must, after the passage of the act, enter in the land office a town-site, whether

the town had been located prior to the passage of the act or afterwards. There are many old settlements in the territory of Arizona which have never applied for a town-site patent. Their growth has not warranted, in their judgment, such action; but if after the passage of the act of 1887, and during its existence, they so desire, the proper officer would be required to make an entry for them; and when the entry shall be made the distribution of the lots would be controlled by the act in the same manner as though the location of the town-site had been made by a new community located after the passage of the act. At the time the entry was made of the Tucson town-site there was already existing an act of the territorial legislature governing the distribution of lots within the lands so entered. That act was passed February 16, 1871, as appears in the Compiled Laws of Arizona of 1871 (chap. 89). We have no information from the record of the date of the entry of the Tucson town-site, but it is certain the entry thereof in the land office was made some time before the first day of July, 1874, the date of the deed patent from the United States to Sidney R. De Long, mayor. Said chapter 89 of the Compiled Laws remained in force until the passage of chapter 2 of title 9 of the Revised Statutes of Arizona, March 10, 1887; and the disposition of lots included in lands entered as the Tucson town-site was controlled and controllable by that act alone. It is nowhere provided in the act of March 10, 1887, either in direct terms or by implication, that its provisions shall take the place of the provisions of chapter 89 of the Compiled Laws, in reference to the disposition of lots in a town-site entered during the existence of that act. The petition states that said lot has had no occupant since 1874, and has been vacant and undisposed of until the petitioner entered thereon on the first day of March, 1900, and asks that the property be deeded to him under the provisions of the statute of 1887, by producing the money regulated by the provisions of the act of 1887, and making the demand under said act. This is in effect asking that all the unoccupied lots in the town-site of Tucson remaining undisposed of to the present time be distributed under the provisions of the act of March 10, 1887, instead of the act of February 16, 1871; and this raises the question of the *status* of the title to the unoccupied lots of town-sites which have been entered under

the act of Congress of March 2, 1867, without territorial legislation, and the effect of the acts of the territorial legislature passed February 16, 1871, and March 10, 1887, in the disposition of such unoccupied lots.

The act of Congress of March 2, 1867, (sec. 2387, Rev. Stats. U. S.,) under which the town-site of Tucson was entered, provides that certain officers are permitted "to enter at the proper land office, at the minimum price, the land so settled and occupied, in trust for the several use and benefit of the occupants thereof, according to their respective interests; the execution of which trusts, as to the disposal of the lots in such town, and the proceeds of the sales thereof, to be conducted under such regulations as may be prescribed by the legislative authority of the state or territory in which the same may be situated." Section 3 of chapter 89 (Feb. 16, 1871) of the Compiled Laws of Arizona, in force at the time when said entry was made, or at least when said patent deed was executed, provides that it shall be the duty of the party entering such town-site "to convey the same to the occupants and inhabitants thereof, according to their respective interests, in the manner hereinafter prescribed." We think it has been fully settled by the supreme court of the United States that, so far as the act of Congress itself is concerned, the trustee had no powers except to execute deeds to the parties in occupancy and possession and entitled to possession at the time of the entry of the land in the land office by the proper authorities. The case of *Cofield* v. *McClelland,* 16 Wall. 331, 21 L. Ed. 339, arose under the construction of the act of Congress passed May 23, 1844, in relation to town-sites, and the act of Congress passed May 28, 1864, for the relief of the citizens of Denver. Each of those acts contained substantially the provisions of the act of March 2, 1867, providing that the entry by the proper officers shall be "in trust for the several use and benefit of the occupants thereof, according to their respective interests." The territory of Colorado, March 11, 1864, provided for the conveyance of the lots to the person or persons who shall have possession or be entitled to possession or occupancy thereof, according to his, her, or their respective rights or interests in the same as they existed in law or equity at the time of the entry of such lands, or to his, her, or their heirs or assigns; and the supreme court

said in reference to said act: "This regulating act of the territory is in harmony with the acts of Congress. It expresses more explicitly than do those acts the statements that the occupation and possession which gives the right is that which exists at the time of the entry of the lands by the probate judge. Those in possession of the land when the entry shall be made by the probate judge are the persons for whom he holds the land in trust, and to whom he is to make the respective deeds. Although less explicitly declared, this is the construction and meaning of the act of Congress also." In *Ashby* v. *Hall,* 119 U. S. 526, 7 Sup. Ct. 308, 30 L. Ed. 469, in discussing the provisions of the act of March 2, 1867, the court said: "As thus seen, the act required the entry of land settled upon and occupied to be in trust for the several use and benefit of the occupants thereof according to their respective interests. . . . The power vested in the legislature of the territory in the execution of the trust upon which the entry was made was confined to regulations for the disposal of the lots and the proceeds of the sales. These regulations might extend to the provisions for the ascertainment of the nature and extent of the occupancy of the different claimants of the lots, and the execution and delivery to those found to be occupants in good faith with some official recognition of title in the nature of a conveyance; but they could not authorize any diminution of the rights of the occupants when the extent of their occupancy was established. The entry was in trust for them, and nothing more was necessary than an official recognition of the extent of their occupancy." As early as 1859 the supreme court of Michigan, in *In re Selby,* 6 Mich. 193, in construing the act of May 23, 1844, said: "While the entry is only allowed to cover such land as is actually occupied by the settlers, it must nevertheless, be made according to government subdivisions, and the law does not permit these to be broken in upon. Thus, in most cases, some land would be found in each subdivision not actually built upon or otherwise occupied for town purposes. These lands the act clearly contemplates shall be sold, and the proceeds are to be disposed of under regulations to be adopted by the state legislatures, who are to establish rules and regulations for the whole execution of the trust. . . . While the act of Congress leaves the details of the use of the

proceeds of the surplus fund to be regulated by the legislature, it is very clear that the law designed that it should be used for the common benefit in some way." The supreme court of Colorado, in the case of *City of Denver* v. *Kent,* 1 Colo. 336, in discussing the same provisions, said: "The power of the corporate authorities is limited to the act of entry, and, when the land is entered, the party or parties so entering it become invested with a trust the execution of which is under the sole and exclusive direction of the local legislature. Until the legislature points out the method and prescribes the rules of procedure, the trustees are wholly incapable of conveying the legal title to the beneficiaries of the trust, or of disposing of the land for any purpose or to any person. . . . Some land would be found in each subdivision not actually built upon or otherwise occupied for town purposes. What, then, is to be done with this land not occupied or improved? To whom is it to go? Clearly, not to the general government, for its title has ceased by the issuing of the patent; not to the territory, for it never had any interest; not to the trustee, for he is a mere conduit or channel through which the title passed from the government to the *cestui que trust;* not to the individual citizen, for the act of Congress defines the extent of his individual interest. The trust is manifestly a double one,—the first a trust for the inhabitants of the town and as individuals; the other a trust for them collectively and as a community. . . . This whole matter is left to the local legislature. To it belongs the creation of the tribunal before whom individual rights shall be defended. It prescribes the kind of evidence necessary to make good a claim of title; it prescribes what kind of disposition shall be made of the money arising from the sale of lots; and in fact has full and plenary power over the whole subject-matter of the trust. And to strengthen this power conferred by Congress the law declares any act done by a trustee inconsistent with or in violation of the rules and regulations prescribed by the legislature for the execution of the trust shall be void and of no effect. Congress seems to have contented itself with declaring simply who might enter the land and denominating the *cestui que trust.* All else it hands over to the territorial legislature, which is better fitted, on account of its proximity to the subject-matter of the trust, to supervise and direct its

details.'' In reference to their own territorial statute they say: ''By an oversight the legislature made no provision for the disposition of portions of this land to which no individual claim existed, and there is nothing in either act of Congress from which a power of sale in the trustee can be inferred and much to repel such an inference. The acts of Congress leave it altogether to the territorial legislature to determine what disposition shall be made, within the objects of the trust, of town lots belonging to the community at large, and of the proceeds of such of them as may be sold. This part of the trust most clearly cannot be executed without the intervention of local legislation. The trustee cannot sell under the acts of Congress, because they do not authorize him to sell any portion of the trust property, or to make any disposition whatever of moneys that might come into his possession on such sale. It being evident that it was the intention of Congress that the lands included within the town-site, and to which no rightful claim exists on the part of any individual, should be sold, and the proceeds disposed of under the directions prescribed by the legislature, who are to establish rules and regulations for the whole execution of the trust; and it being further evident that the legislature failed to provide for the disposition of the same, it is clear to us that any sale of such land made by the probate judge or trustee in the absence of these rules and regulations was wholly unwarranted, and absolutely void. It was entirely competent for him to make conveyances to those having a valid and rightful claim to the land at the time of entry, provided they furnished the proper and requisite proof. Beyond this his acts were *ultra vires,* and could in no manner affect the rights of the community.'' The same court, in the case of *Town of Aspen* v. *Rucker,* 10 Colo. 184, 15 Pac. 791, said: ''The construction given by the courts of this state to the acts of Congress is that the entire town-site is required to be held in trust until finally disposed of as trust property. It is held in *City of Denver* v. *Kent,* 1 Colo. 336, that those portions to which no valid claims exist in favor of individual occupants are to be held in trust for the occupants collectively as a community. It was again held in *Georgetown* v. *Glaze,* 3 Colo. 234; and also in similar terms in *Smith* v. *Pipe,* 3 Colo. 187, to have been the purpose of the acts of Congress

to vest the estate and trust powers, not in the corporation itself, but in the trustee or trustees, in his or their official or political capacity, and to limit it to the successor in trust until the trust should be finally exhausted. The court further held that the entry in the name of the corporate officials of a town could not by construction of law inure to vest the estate in the corporation, and that no such intent was manifest in the act." The same doctrine is held by the supreme court of Utah in the case of *Lockwitz* v. *Larson,* 16 Utah, 275, 52 Pac. 279, and by the supreme court of Washington in the case of *Bingham* v. *City of Walla Walla,* 3 Wash. T. 68, 13 Pac. 408, and again in *Newhouse* v. *Simino,* 3 Wash. 648, 29 Pac. 263. Our own supreme court, in the case of *Clark* v. *Titus,* 2 Ariz. 147, 11 Pac. 312, held the same doctrine. They said: "The mayor held the title to these lots in trust for the occupants. He had no power to convey title to any one but to the occupants. The legislature of the territory had the power to regulate the manner of disposal of the lots and the execution of the trust, but there was no power to change or alter the conditions of the trust. The very object and purpose of the law was to prevent any private person or corporation from getting title to lots included in such town-site and holding the same for purposes of speculation." And again, in *Manufacturing Co.* v. *Tillman,* 3 Ariz. 122, 21 Pac. 818, they say: "The probate judge, after entering said land, holds it in trust for the benefit of those actually occupying the town-site, and it is his duty to make deeds therefor to the actual occupants, respectively, and to none others; and when he has made a deed for any portion thereof to a person it will be presumed, in the absence of anything to the contrary, that he has made the deed to the proper person, and a person who has no interest in the land will not be allowed to question his acts." And, quoting from the case of *Sherry* v. *Sampson,* 11 Kan. 611, they say: " 'An occupant, within the meaning of the town-site act of Congress, is one who is a settler or resident of the town, and in the *bona fide* actual possession of the lot at the time the entry is made. One who has never been in the actual possession of a lot cannot be said to be an occupant thereof.' " From these decisions, which we regard as the settled law, it is apparent that the unoccupied lots undisposed of after the trust has been primarily performed for the

benefit of those in occupation at the time of entry can be disposed of only by methods prescribed by the legislature.  At the time the Tucson town-site was entered, or the patent deed was executed therefor to Sidney R. De Long, the then mayor of Tucson, chapter 89 of the Compiled Laws, approved February 16, 1871, was in force, and did make provision for the disposition of lots under the entry; and it did assume to make full provision for all such lots.  Whether it effectually did so, and whether the act was sufficiently full and comprehensive and sufficiently minute and specific to perfectly accomplish the purpose of such disposition, is not now before us for discussion or settlement, and we only mean to say that the town lots in the town-site of Tucson were regulated by the statute of 1871 instead of by the statute of 1887.  If the statute of 1871 did not succeed in accomplishing the purpose of providing a method for the disposal of all the lots within the town-site, those lots which remain with the trustee still remain with him to be disposed of under legislative proceedings.  The act of 1887 in no way, either by express language or by implication, undertook to deal with the lots in town-sites which were entered during the existence of, and regulated by the provisions of, the law of 1871.  Such lots were either disposed of under said act, or are disposable of under the provisions of said act, or yet remain with the trustee to be disposed of as the legislature may direct.  If the title to those lots yet remains in the successors to the original trustee, Sidney R. De Long, they remain there until the action of the legislature may provide for their disposition.  The act of 1887 only provided for lots within town-sites entered after the passage of the act, whether the settlement of the community or the location of the town had been made before that time or after.  The demurrer to the petition for a writ of *mandamus* on the defendant, Gust. A. Hoff, asking him to act under the provisions of the act of March 10, 1887, was properly sustained.  Judgment of the district court is affirmed.

Sloan, J., and Doan, J., concur.