| 44 | 467 |
| 72 | 260 |
| 44 | 467 |
| 81 | 392 |
| 44 | 467 |
| 84 | 67 |
| 44 | 467 |
| 120 | 74 |

THE BOARD OF SUPERVISORS OF CASS COUNTY v. CHARLES G. BANKS ET AL.

*Dedication of land to the public—Acceptance—Ejectment—Election to take judgment for value.*

A dedication of land to the public may be made out without any public record of it; the failure to record is important only as it concerns the naked legal title which the record would have vested in the designated parties in trust for the purposes intended.

A common law dedication of lands to the public must be accepted within a reasonable time or the offer will be considered withdrawn.

The owners of village property platted it, and marked a square on the plat as a "public square," and in an accompanying description declared it to be "designed for buildings for public uses." The square was subdivided by streets, and no public use was ever made of two of the subdivisions, though the public authorities once assumed to convey the land included in the square to private persons "for the uses and purposes for which said square and grounds were conveyed to said county;" they also reserved the right to erect a court house on a specified parcel. *Held,* that the reservation tended to negative the intention to use the rest of the land for public purposes; and that the clause in the deed recognizing the purpose of the offer of dedication, was not an acceptance of such offer.

The institution of a suit by public authorities for the possession of land which had been offered for public uses, was not an acceptance of the dedication.

A county cannot bring ejectment for land which the owners had offered to dedicate for public uses nearly fifty years before, if it has never accepted the offer, and has no intention of using it for public purposes.

Where a grantee's right to a parcel of land is confined to the use of it for a specific purpose, he cannot, on bringing ejectment for it, elect to abandon his claim and take the value of the land.

A donee has no right as against the donor to sell for one purpose what was given him for another.

Error to Cass.    Submitted Oct. 15.    Decided Oct. 27.

EJECTMENT.    Plaintiff brings error.    Affirmed.

*Edward Bacon* for plaintiff in error.    Ejectment lies at the suit of the proper municipality to recover against persons wrongfully holding any part of a public square : *Gardiner v. Tisdale* 2 Wis. 153 ; *San Francisco v. Sullivan* 50 Cal. 603 ; *Winona v. Huff* 11 Minn. 119 ; *Mankato v. Willard* 13 Minn. 13 ; *Dummer v. Selectmen* 20 N. J. L. 86 ; *M. E. Church v. Hoboken* 33 N. J. L. 13 ; *Klinkener v. School Directors* 11 Penn. St. ; 3 Wait's Actions 7, 34 ; possession under deeds recognizing the public square is not an adverse holding : *Bridges v. Wyckoff* 67 N. Y. 130 ; *In re Opening*

*Thirteenth St.* 73 N. Y. 179 ; *St. Vincent Orphan Asylum v. Troy* 76 N. Y. 109.

*Howell & Carr* and. *C. A. Kent* for defendants in error. An offer of dedication to the public must be accepted before the rights of the public are fixed : *Wayne County v. Miller* 31 Mich. 447 ; *Field v. Manchester* 32 Mich. 279 ; erecting public buildings elsewhere than on land dedicated for that purpose is a refusal of the offer : *Sinclair v. Comstock* Har. Ch. 404 ; taking possession of part of premises conveyed, and actually claiming the whole, and doing such acts as would be trespass if title was not held, is a possession of the whole even though the deed conveys several contiguous parcels, and possession is taken of one alone : *Williams v. Ballance* 23 Ill. 193.

Cooley, J.   The plaintiffs in error brought suit in the circuit court to recover lands in the village of Cassopolis which were claimed under a dedication by the original proprietors for a public square.   The case comes before us on a finding of facts by the circuit judge, upon which he ordered judgment for defendants.   The following are the important facts :

By an act to amend an act entitled " An act to provide for establishing seats of justice," approved March 4, 1831, it was provided among other things that the governor, with the advice and consent of the legislative council, should appoint three commissioners to re-examine the proceedings which had taken place in relation to the establishment of a seat of justice for the county of Cass, and to confirm the same, or to make a new location as the public interest, in their opinion, should require.   The commissioners were authorized to accept donations of land, etc., for the use of the county ; they were to report to the governor and file their decision with the secretary of the territory, and the governor was required thereupon to issue a proclamation announcing the decision and establishing the county seat agreeably thereto.   Laws 1833, p. 533 ; 3 Territorial Laws 898.

Commissioners were appointed as contemplated by this act, and proceeded in the discharge of their duties. On the fifteenth day of November, 1831, E. B. Sherman, A. H. Redfield, Ephraim McCleary, Abram Tietsort, jr., and Oliver Johnson presented for record in Cass county a plat of the village of Cassopolis duly signed by them and acknowledged. On this plat were marked a great number of blocks and lots fronting on streets which crossed each other at right angles, and at the intersection of two of which, named Broadway and State streets, a square 20 rods by 26 was marked and designated " Cassopolis public square." In the accompanying description this square was declared to be " designed for buildings for public uses," and a considerable list of lots was enumerated as " donated to the county to be disposed of by their agent." The register of deeds received this plat, but instead of copying it upon his records as he should have done, he merely attached it by paste to a fly-leaf of one of the record books. Broadway and State streets were each six rods wide, and they were opened and used as public highways across the square, thus dividing the public square into four distinct quarters with streets as boundaries on two sides.

While the subject of locating the county seat was in the hands of commissioners the proprietors of the village plat made offers in writing to donate forty acres to the county provided the county seat should be located thereon. What action, if any, the commissioners took upon these offers is not found, but they reported in favor of such location, and on December 19, 1831, the governor issued his proclamation locating the county seat at a point on the plat which, as near as we can understand by the description, is at or near the center of the public square. 2 Territorial Laws 810.

Previous to March 31, 1831, the meetings of the Board of Supervisors of Cass county had been held at Edwardsburg, but on that day the board adjourned to meet at Cassopolis, after entering upon their record a resolution " that a gaol be built at Cassopolis, the county seat."

On April 15, 1833, the supervisors called for further donations from the village proprietors, and in that year and the

next deeds were made by Tietsort & Sherman conveying lots to the county, and subsequently by other proprietors.  On the same day last mentioned the supervisors also designated a lot—not the public square—on which a jail should be built, and one was built accordingly and was used continuously by the county until 1853.

In June, 1833, A. H. Redfield was made agent for the county to sell lots which had been received as donations, and many sales were made by him.

In October, 1835, the Board of Supervisors voted to erect a court-house on a lot designated—not the public square— and one was erected and used until 1841, when a new one was built as hereinafter stated.

August 7, 1839, the county commissioners of Cass county, who had succeeded to the rights and powers of the supervisors, for the nominal consideration of six thousand dollars, gave a deed to Darius Shaw, Joseph Harper, Jacob Silver, Asa Kingsbury and A. H. Redfield of " all that certain tract or parcel of land in said village of Cassopolis ; *first*, the public square and public grounds, with their privileges and appurtenances, for the uses and purposes for which said square and grounds were conveyed to said county," reserving the privilege to erect a court-house on the northeast quarter, and *second*, a large number of other lots which had been donated to the county as afore stated.  The deed was an ordinary deed of bargain and sale and contained the usual covenants.  Simultaneously the grantees in this deed gave to the commissioners their bond in the penal sum of $12,000, conditioned as follows : " Whereas, certain village lots in said village of Cassopolis and certain sums of money were formerly given to said county of Cass by the original proprietors of said village and by others for the purpose of erecting public buildings in said village for the use of the county, and whereas the said commissioners have this day given to us a warranty deed for a certain part of said village lots and property, and also one order upon the treasury of said county for the sum of $2000 : Now if we, the said Darius Shaw, Asa Kingsbury, Jacob Silver, Joseph Harper and Alexander H.

Redfield, shall erect or cause to be erected in said village within two years from the date hereof on such ground as the said commissioners shall select a court-house fifty-four feet in length etc. (giving full specifications), then this obligation to be void, otherwise to be and remain in full force and virtue." The court-house was completed in accordance with this undertaking, the northeast quarter of the public square having been designated as the location.

In 1853 a new jail was erected by the county on the same quarter of the public square with the court-house, and in 1860 a building for county offices was erected on the northwest quarter of the same square. These are all the public buildings which have ever been erected on the public square, and they left the south half of the square entirely unoccupied.

When the county ordered the erection of the building for county offices on the northwest quarter of the square, the grantees in the deed from the county commissioners, of August 7, 1839, protested against their action and notified the supervisors that the county did not own all of the public square, but their protest was not heeded. It will be perceived that this action took place twenty-nine years after the plat was made, and after the square was dedicated to the public, if any dedication was made by that plat.

The condition of the square, then, in 1860 was this : The county had placed two public buildings on the northeast quarter and one on the northwest quarter. The other two quarters, which were separated from the occupied parts by streets, were not occupied by the county in any manner, nor does it appear that there was any proposition by the county to make use of them for any public purpose. A deed of the whole square had been given by the county commissioners to the parties who erected the court-house, but what idea respecting its ultimate disposition was in the minds of the parties at the time we are not advised. The uses for which the square was conveyed to the county were alluded to, as if they were to be observed and accomplished, but if the square was to be devoted exclusively to public buildings for county use

and occupation, it seems a very idle and absurd thing to include it in the deed at all. The other lots conveyed were for the benefit and enjoyment of the grantees, to compensate them for their expenditures in erecting the court-house, and a strong inference arises that some personal advantage to the grantees from the conveyance of the square was expected also, or at least was looked upon as possible. It may perhaps have been thought that only a part of the square would be required for public buildings, and have been intended that the remainder would belong to the grantees. It is certain that as early as 1860 these parties began to claim as their own all that had not been previously appropriated by the county for a court-house site.

In 1836 Kingsbury commenced business as a merchant in a store situated immediately south of the south-west quarter of the public square, and used in connection therewith a part of that quarter for the storage of lumber, shingles, barrels and boxes, and with a hitching rack for horses. In 1856 he built a new store, seventy-two feet in length, with stone foundation, one foot of which for the whole length was upon the square. The cellar ways for the store were on the square, and were walled up at the sides with stone. This store with the cellar ways has since been occupied by Kingsbury and his lessees, and use has been made of the south-west quarter in connection therewith. From 1858 to 1869 a tenant had hay scales on the square, set over a walled pit, near the center of the quarter; he moved them in this year last mentioned to another part of the same quarter where he continued to use them.

In 1865 Joseph Harper and Darius Shaw deeded their interest in the public square to Daniel Blackman. Redfield also deeded to Blackman in 1869. In 1870 Blackman deeded to Kingsbury; the heirs of Tietsort gave him a deed in the same year, and Silvers another in 1873. Blackman, it seems, had set up some claims of title to the southeast quarter of the square in 1863, and had erected a building upon it which he rented for a law office until 1878 when it was moved away and a brick store erected in its place. The judge's

finding states that the southeast quarter is now built up and claimed by the applicants. In 1868 Kingsbury platted the southwest quarter of the square into six lots and sold five of them to persons who erected two-story brick stores thereon which they now occupy and claim as owners. Kingsbury also erected a similar building for a banking house. The value of these buildings is $35,500; the value of the six lots without the buildings $2200. The buildings were completed in 1869 and 1870; they have been taxed to the occupants and the taxes paid ever since 1868.

In addition to the foregoing, it seems important to mention only the following facts: In 1842 the board of supervisors by resolution requested the prosecuting attorney to examine the records of the county and ascertain whether there was on record any deed or deeds from the original proprietors of the village of Cassopolis conveying to the county the whole or any part of the county square for the purpose of erecting the necessary county buildings, and, if so, whether sufficient or not, and if not, what means should be employed to perfect the title. The records of the board do not appear to show any response to this resolution. In March, 1865, the board passed a resolution reciting that certain individuals had put buildings or other fixtures on the public square which the board had theretofore permitted to remain without rebuke; therefore the board "do hereby give notice to all such persons to remove said fixtures and buildings from said public square on or before the first day of October next." It does not appear that any attention was paid to this notice by the parties concerned. In 1877 Kingsbury conveyed to the county two parcels of land on the northeast quarter of the public square, for each of which the county paid him fifty dollars. One of these was the ground on which the jail had been erected.

On these facts the question for our determination is whether there has been any dedication to the county and acceptance by it of the land claimed in this suit. To dispose of this it seems only necessary to re-state briefly a few of the leading facts. The laying out of the plat in 1831 was a distinct

offer to dedicate the whole of the public square for public buildings. The failure to record the plat was important only as it concerned the naked legal title, which in case the record had been made would have been vested in the county in trust for the purposes intended. 2 Terr. L. 577. But a dedication may be made out without any public record whatever. *Lee v. Lake* 14 Mich. 12 ; *Baker v. Johnston* 21 Mich. 319. One difficulty with this offer was, it was not in terms made to the county, nor was there any indication what sort of public buildings it was intended for. The offer being made in connection with a gift of lands to secure the location of the county seat upon the plat, the inference is very strong if not conclusive that the wants of the county were to be provided for, and if the county had proceeded to appropriate the whole square to its needs, for county buildings, this, we think, would have been a good acceptance of the offer, and would have perfected the dedication. The county authorities saw fit, however, before any use whatever had been made of the public square, to convey it to Kingsbury and his associates, reserving only to the county " the privilege to erect a court-house on the northeast quarter of the public square ;" and though the conveyance is recited to be made " with the privileges and appurtenances for the uses and purposes for which said square and grounds were conveyed to said county," yet as the conveyance is made by a deed which also conveys a large number of village lots to the grantees for their own use and benefit, it seems scarcely open to doubt that the intent was that all right of control on the part of the county was meant to be conveyed to the grantees. And up to this time the only distinct act of acceptance that appears on the part of the county is the reservation contained in this deed of the privilege to erect a court-house on the northeast quarter.

Assuming that the offer to dedicate still remained open, notwithstanding this conveyance, public buildings for the use of the township or village would seem to be as much within it as public buildings for the county. But no proposition to erect such buildings appears, and it is more than twenty

years after the making of the plat, and more than twelve years after this conveyance before the county took any further steps in the direction of acceptance. A jail was then erected on the same quarter with the court-house, but it seems that Kingsbury disputed the right to do this, and the county subsequently purchased the land of him. The next step in the direction of acceptance took place in 1860, when the building was erected for county offices. This was twenty-nine years after the original offer, and twenty years after the grant to Kingsbury and his associates, and the building was put up against their protest.

When this suit was instituted, forty-eight years had elapsed since the original offer of dedication was made, and thirty-nine since the county had given a deed which purported to convey away the premises. Meantime the county has never made use of the land now in dispute; never offered to erect any public buildings upon it, and never, so far as we are informed, expressed an intention to do so at any time. If it were not separated from the lands occupied for county buildings by public streets, we might suppose the purpose was to reclaim it for yards in connection with those buildings, but the deed of 1840, which made a reservation on the northeast quarter only, would tend to negative any such supposition: *Sinclair v. Comstock* Har. Ch. 404. Meantime the county, though protesting on one or more occasions, has suffered valuable buildings to be erected on the grounds, under a claim of right, to be occupied for nine years, and taxes collected upon them. The first distinct and unequivocal act evincing a purpose to appropriate the land for county purposes is the bringing of this suit, and as has already been intimated, this is not accompanied or preceded by any resolution or announcement indicating an intent to make use of the land for public buildings.

Has then a dedication been perfected? We think not. A dedication must be accepted within a reasonable time or the offer will be considered as withdrawn. *Baker v. Johnston* 21 Mich., 319; *Wayne County v. Miller* 31 Mich., 447; *White v. Smith* 37 Mich. 291. The mere recognition of the

purpose for which the offer was made, in a conveyance to third persons, is no acceptance, for it is not a step in the direction of occupation and use in the manner proposed. The offer implies that the proprietor has an interest in the intended purpose being accomplished, and the consideration which completes the transaction is not mere words of recognition or of acceptance, but an actual appropriation of the property within some reasonable time for the use designed. The proprietors waited for this for more than thirty years, and then formally withdrew their offer by deeds of conveyance to Kingsbury. Even then the county gave no evidence of an intention to put the lands to any such use as was designed. It can hardly be necessary to add that the mere institution of a suit is no acceptance of an offered dedication.

One view which may be taken of this case is the following: The proprietors of the village plat made the broad offer to donate the square, twenty rods by twenty-six, for public buildings generally, without designating whether they should be buildings for state, county, township or village purposes, or for purposes of corporations of a semi-public character, such as churches, library societies, etc. The county accepted for its purposes a site for a court-house, and at the same time transferred to trustees any power of control it might have or be supposed to have in respect to the remainder. By this acceptance and transfer, and by the subsequent conveyance by the proprietors to Kingsbury, the dedication to the county must be deemed to have been restricted to the actual acceptance of a court-house site, as being adequate to the county wants, and the county could not, therefore, claim as of right any further land for its uses. If the trustees to whom the county assumed to convey had permitted the erection of other public buildings at any time after receiving the commissioners' deed, the county could have had no possible ground of complaint; and if they assumed that such land as was not actually occupied by the county, and not actually taken or proposed to be taken for public buildings of any sort within a reasonable time after receiving the commissioners'

deed was their own, we cannot see why they were not fully warranted by the circumstances.

But let us contemplate for a moment the real nature of this suit. It is an action of ejectment, in which the county claims a title in fee to the land in dispute. But the county never at any time had the title. Neither did it ever have possession. Its authorities once assumed to convey the title, by deed of warranty, to persons under whom the defendants claim. The only possible claim the county can set up to the land is that it needs it for public buildings, and there is not even a suggestion that the county now or at any future time proposes to put it to any such purpose. It could not use the land for public buildings until private buildings on it were removed, and as these were built under a claim of right many years ago, the county must first pay the owners their value. But this value far exceeds any possible value the land can have to the county for public buildings. If, on the other hand, the county shall elect to abandon the land to the claimants in possession and demand payment for the land without the improvements, it will demand that for which it has no substantial claim whatever. The value of the land is assessed at $2200 ; but this is for the fee ; and the county at most has only a right to occupy with its buildings ; and when it waives this right, it has no other to be paid for. See *Bertram v. Cook* ante p. 396.

To accept the assessed price would be equivalent to a sale, and the county never had anything which was the subject of sale. The law no doubt has some anomalies, but none so great as would be the right, as against a donor, to sell for one purpose what he has proposed to give for another. In short, there seems to be no possible aspect in which the plaintiff's claim can be viewed that can give to it even the semblance of plausibility.

The judgment must be affirmed with costs, and the record remanded.

MARSTON, C. J. and GRAVES, J. concurred.

CAMPBELL, J.   If as my brethren think there was nothing more than a common-law dedication, I concur in holding there can-be no recovery.   I reserve my opinion as to the character of the dedication by the plat.