THE DIAMOND MATCH COMPANY v. THE VILLAGE OF
ONTONAGON ET AL.

72 249
127 458
72 249
s40ᴺᵂ 448
131 ᶜ517

*Town plats—Dedication of land for streets—Acceptance—Estoppel
—Town-site—Patent to district judge in trust.*

1. In a contest between the owner of adjoining land and a municipal corporation claiming the existence of a public street or highway over such land, the burden of proof is upon the municipality. *Mining Co. v. Mason*, 23 W. Va. 211; *Miller v. Town of Aracoma*, 5 S. E. Rep. 148.

2. The object of the act of Congress (5 Stat. at Large, 657) "for the relief of citizens of towns upon the lands of the United States, under certain circumstances," and of Act No. 204, Laws of 1861, authorizing the district judge of the Upper Peninsula to convey certain lands held in trust under said act of Congress, was to protect the rights of *actual* occupants, which is fully done by extending to them the principles which have been so often applied for a like purpose when a proprietor of land has platted it into a town-site, but not so as to effect a legal dedication, and sold land to individuals in accordance with the plat.

3. As between the proprietor of land which he has platted into a town-site, but not so as to effect a legal dedication, and purchasers from him according to said plat, they are entitled to have the streets necessary or convenient for their use and enjoyment of the property so purchased kept open for their own and the public's use. But such proprietor is not estopped from reclaiming or closing any street or portion thereof delineated on the plat, where private rights are not directly affected, and as against the municipality claiming the streets, where the public have not acquired rights by user, or acceptance of the offer to dedicate, indicated by the platting, the owner is not estopped. He may revoke or recall said offer before actual acceptance at any time, when the plat has not been executed in accordance with the statute, and placed upon record.

4. One of the ordinary meanings of the word "lot" given by lexicographers is "that portion of ground which is allotted or assigned to any one, and hence a distinct portion of land."

5. Proof of the acceptance of the land dedicated by its owner to the public use must be unequivocal and convincing.

6. In this case, it is held that the testimony fails to show either a dedication or an acceptance of the land in dispute, as a street; and that the complainant shows itself in possession of said land, claiming title,. and, as against an intruder who threatens to enter and dispossess it for the purposes of a public street or highway, it shows a right to equitable relief by injunction.

7. The following propositions are summarized from the opinion of Mr. Justice CHAMPLIN:

*a*—The position assumed, that the United States by its patent to Judge Goodwin, as trustee, in trust, dedicated the land platted as streets to public use, is too broad.. The implication from the grant is that the land patented had been settled upon and occupied as a town-site, and the grant was made in trust for the several use and benefit of the occupants thereof, according to their respective interests.

*b*—Congress intended by the act of 1844 (U. S. Rev. Stat. § 2387) that as to unoccupied lots the Legislature might authorize the trustee to make a survey and plat, and dedicate the streets and public grounds to the public use, or it might authorize a sale in such parcels as they should deem the situation of the town, its probable future, and its circumstances should require.

*c*—The mention by the Legislature in a recital to Act No. 204, Laws of 1861, of the fact that the lands held in trust by Judge Goodwin had been surveyed and laid out into town lots and blocks, and are known as the village of Ontonagon, and additions thereto, does not expressly adopt or ratify such survey or plat, if, indeed, it would be competent for it to do so. The legal title had passed from the United States to the trustee, and he would be the only competent person to dedicate the land to public uses.

Appeal from Ontonagon. (Williams, J.) Argued June 8, 1888. Decided November 1, 1888.

Bill to enjoin the disturbance of the possession of complainant of land claimed by defendants as a public street. Defendants appeal. Decree modified and affirmed. The facts are stated in the opinion.

*Stone & Gray,* for complainant, contended:

1. The complainant represents and stands in the place of the occupants of this property, when the patent was made, and holds the equitable title thereto; citing *Cofield v. McClelland,* 16 Wall. 331; *Hussey v. Smith,* 99 U. S. 20; and is therefore in a position

to invoke the aid of this court in securing the enjoyment and possession of the property.

2. A dedication under our statute can be made by the proprietor or owner of the land only, and, if one having no title should make and record a plat, he would not be estopped from claiming the lands therein purported to be dedicated, under a subsequently acquired title, unless the public had done some act in reliance upon the plat that would make the claim inequitable; citing *Lee v. Lake*, 14 Mich. 12; *People v. Jones*, 6 Id. 176; *Detroit v. Railroad Co.*, 23 Id. 201.

3. The evidence shows that what is known as Copper street, upon the island, has been for a number of years past used the same as the adjoining blocks, and that it has never been used as a street. The user shown is neither decisive, general, nor long enough continued; citing *Gould v. Glass*, 19 Barb. 179; *Smith v. State*, 3 N. J. 130; *Hoole v. Atty. Genl.*, 22 Ala. 190; *Kilburn v. Adams*, 7 Metc. 39.

4. An acceptance of an offer to dedicate, by a user of a street, is only binding or good as to that portion of the street actually used by the public, and so long as there has been no acceptance of the grant or offer to dedicate, either by the action of an authorized body or by a public user, the adjoining owners may withdraw such offer, and any act of theirs which goes to show their intention to use and occupy such street for private purposes, would amount to a withdrawal; citing *People v. Beaubien*, 2 Doug. 256, 286; *People v. Jones*, 6 Mich. 176; *Lee v. Lake*, 14 Id. 12; *Baker v. Johnston*, 21 Id. 319; *Detroit v. Railroad Co.*, 23 Id. 174; *Field v. Manchester*, 32 Id. 279; *Cooper v. Detroit*, 42 Id. 589; *Buskirk v. Strickland*, 47 Id. 391; *Plumer v. Johnston*, 63 Id. 165.

5. Merely traveling or passing over land for any length of time will not convert it into a public highway. It must have been accepted as such by the public authorities; citing *Irving v. Ford*, 65 Mich. 241 (32 N. W. Rep. 601, and numerous cases cited in note); *Scheimer v. Price*, Id. 638.

*C. F. Button* (*Ball & Hanscom*, of counsel), for defendants, contended:

1. The platting by Paul, the conveyance in trust to the district judge, and Act No. 204, Laws of 1861, make a complete and irrevocable dedication to the public of all the streets marked on the plat, and these, with the provision requiring the proceeds of the sale of lots to be expended in grading and improving "the streets of the said town-site of Ontonagon," in connection with the act of Congress, make the dedication and

acceptance complete, not of a part of the streets, nor of those parts which might be used as highways at that particular time, but of the streets according to the plat; citing *Parcher v. Ashby*, 1 Pac. Rep. 204.

2. That portion of Copper street which is upon the main-land is conceded to be one of the public highways, as it appears upon the original plat, and Houghton and Ontonagon streets, running parallel therewith and crossing the island, and connected therewith by bridges, have always been recognized as public highways of said village, and there is nothing to show why there should be any distinction between these streets, as regards the rights of the public therein. They are each a part of the original plat or plan of the village of Ontonagon, and as old as the town itself, and have been used by the public for more than 30 years. This is evidence of acceptance by the village, and the fact that no work has been done upon that part of Copper street upon the island can have but little, if any, significance; citing *Com. v. Moorhead*, 12 Atl. Rep. 424.

3. Every deed introduced in evidence by complainant, bearing date since the platting by Paul, describes the property intended to be conveyed by lots and blocks, according to the recorded plat of the village; and this fact of itself estops the complainant from disputing the dedication and acceptance of the street; citing *Marble v. Price*, 54 Mich. 466.

4. Complainant has failed to show *non-user* of the street, as alleged in its bill. [Counsel discuss the testimony at length, in support of this proposition.—REPORTER.]

5. The foregoing evidence not only disposes of this claim, but establishes the fact of acceptance by the public of Copper street on the island, as a highway and street in the village. So far as the public was concerned, no actual act of acceptance, save by user, could have been manifested, for the reason that there were no corporate authorities in said village until its incorporation in 1885; citing *Baker v. Johnston*, 21 Mich. 340.

6. Complainant has failed to show title by deed or estoppel to the land in question.

7. Complainant has failed to establish title or estoppel by adverse possession; citing *Yelverton v. Steele*, 40 Mich. 538; *Jackson v. Woodruff*, 13 Am. Dec. 525; *Marble v. Price*, 54 Mich. 466.

CHAMPLIN, J.  The Ontonagon river empties into Lake Superior in section 25, township 52 N., range 40 W.; and passes through the section in a north-westerly direction. The shore of Lake Superior at this point runs about

south-west and north-east.    Within the government sur-
vey of section 25 there is an island in the river, surveyed,
and known as "Lot 4." The river is navigable on both
sides of this island through the section, the main part of
the river and the main channel being on the west side.
The width of the channel on the east side varies, but at a
point designated as "Copper Street," on the "Plan of
the Town of Ontonagon," is 100 feet wide.

The village of Ontonagon was incorporated by an act of
the Legislature, approved March 20, 1885, entitled—

"An act to incorporate the village of Ontonagon, in
the township of Ontonagon, county of Ontonagon, and
State of Michigan."

A township by that name, including within it the same
territory, had existed for a number of years.    The record
before us does not show the date of its organization, but
the county of Ontonagon was first incorporated in 1848.

In 1854 one James K. Paul caused to be recorded in
the office of the register of deeds of Ontonagon county
a plat of a town, designated as a "Plan of the Town
of Ontonagon," which embraced the territory included in
the United States survey of the public lands described as
lots numbered 1, 2, 3, 4, 5, and 6 of section 25, town-
ship 52 N., range 40 W.    Lots 1, 2, and 3 lie on the east
side of the river, lot 4 is the island, and lots 5 and
6 lie on the west side of the river.    In this plan he laid
out the land into blocks and lots, streets and alleys.
The blocks and lots are numbered, and the names of the
streets appear thereon.    On the east side of the main
channel of the river the blocks are numbered from 1 to
63, and on the west side from 1 to 15.    It thus appears
that the main part of the plan was on the east side of
the river.

The design of the plan evidently was that the streets
on the east side should project across the east channel,·

and run across the island, and terminate at the main channel of the river, these streets on the island forming the boundaries of the blocks, which are numbered from 1 to 10, inclusive; and nine streets appear thus to have been projected across the island.

It is not claimed, and there is no evidence in the record, that Paul was the owner or proprietor of the land which is embraced in the plan recorded, nor is there any evidence that he ever afterwards acquired the legal title thereto.

By an act of Congress, approved May 23, 1844, entitled "An act for the relief of citizens of towns upon the lands of the United States, under certain circumstances," it was provided that, whenever any portion of the surveyed land of the United States had been or should be *settled upon and occupied* as a town-site, it should be lawful, if the town was unincorporated, for the judge of the county court to enter the land, in trust for the several use and benefit of the occupants thereof, and according to their respective interests; the execution of the trust as to the disposal of the lots in such town, and the proceeds of the sale thereof, to be conducted under such rules and regulations as might be prescribed by the legislative authority of the state or territory in which the same is situated. 5 Stat. at Large, 657; U. S. Rev. Stat. (2d ed.) § 2387.

The Legislature of the State of Michigan passed an act which was approved January 29, 1853, entitled—

"An act to authorize the district judge of the Upper Peninsula to hold in trust and convey lands included in the town-site of the village of Ontonagon."

This act came under review in this Court *In re Selby,* 6 Mich. 193, and it was held that it did not confer jurisdiction in the district judge to act in the matter, and

that in so far as the Legislature attempted in such act to dispose of the land it was void.

The next step, as will be seen, after the passage of the act by the Legislature of Michigan in 1853, was the placing upon record by Paul, in January, 1854, of the plan referred to, and following this, in 1856, was the entering by Daniel Goodwin, district judge, of the lots hereinbefore described, together with lot No. 1, in section 36, in the same town and range, and which was made the subject of special legislation by Act. No. 11 of the Session Laws of 1858, similar to that of 1853, and which, although not in question in the case referred to, is governed by the conclusions there reached.

A patent was issued to Daniel Goodwin, district judge, of said land, in trust for the several use and benefit of the occupants thereof, according to their respective interests, which bears date November 28, 1856.

In 1861 the Legislature of Michigan passed an act entitled—

"An act to authorize the district judge of the Upper Peninsula to convey certain land held in trust under the act of Congress of May 23, 1844." Act No. 204, Laws of 1861.

This act recites that—

"The judge of the district court of Upper Peninsula for Ontonagon county has received from the United States, under said act of Congress, and now holds the same subject to and in trust for certain persons interested therein, which lands have been surveyed and laid out into town lots and blocks, and are known as the village of Ontonagon, and additions thereto."

The act then authorizes the judge of the district court, and his successors in office, to exercise full jurisdiction over and concerning said lands, and the disposition thereof to the several occupants entitled thereto, according to the true intent and meaning of said act of. Con-

gress.   It then prescribes the rules and regulations under which the disposition is to be made, and that—

" At the expiration of one year, after notice has been given, as provided in section 1, the district judge shall cause all the lots or parts of the land occupied as such town-site, · not included in any street, alley, or public ground, and not conveyed by deed, as hereinbefore provided, and remaining vacant and unoccupied, to be advertised for sale."

It further authorizes a sale to the highest bidder, and then enacts:

" The proceeds of such sale, after the payment of the expenses, and the proportion of the costs and expenses necessarily incurred in the entry of the town-site of said town of Ontonagon, shall be paid over to the treasurer of the township of Ontonagon, and shall be applied by the highway commissioners of said township to the grading and improvement of the streets of said town-site of Ontonagon."

Nothing appears ever to have been done under this act of the Legislature, passed more than a quarter of a century ago.    On the 2d day of November, 1885, the village council of Ontonagon adopted the following resolution:

" *Whereas,* it appears to this board it is necessary for a bridge to be constructed across the slough on Copper street, for the benefit of the public travel; be it resolved that the street commissioner be instructed to advertise for bids for the building of such bridge at once, to put the street in proper condition for winter use."

The complainant and those under whom it claims title have been in the undisturbed possession of blocks 6 and 7, which would abut on Copper street where it would cross the island if extended, for 15 years or more last passed.    They have erected a saw-mill upon block 6, and have used and occupied the land which would be in Copper street according to the plat where it crosses the island for their private use; have built tramways for running out lumber across such street, have piled lumber along

the west side without regard to any street being there, and have docked up along the east channel, called the " Slough," and extended such dock along the shore and across Copper street, and used the same for their private purposes for four years or more; and complainant now claims the ownership of the land in the so-called " Copper Street," and claims that the village has no right to said street, nor the public to the use thereof as a street. No work was ever done by the municipal authorities, either township or village, on that part of Copper street where it crosses said island. Considerable testimony was introduced on the one side to show that it had never been used or traveled by the public as a highway, and on the other to show its occasional use by the public as such highway.

In a contest between the owner of adjoining land and a municipal corporation claiming the existence of a public street or highway over such land, the burden of proof is upon the municipality. *Mining Co. v. Town of Mason,* 23 W. Va. 211; *Miller v. Town of Aracoma,* 5 S. E. Rep. 148.

Upon a review of the testimony I do not·think a highway by user has been made out, or such unequivocal acts of use by the public of this portion of Copper street as implies an acceptance by the public. As before stated, Paul was not the owner or the proprietor of the land covered by the plat when he placed it upon record.

The law relating to town plats in force at the time required such maps or plats as were required to be recorded to particularly set forth and describe all the public grounds within such town, by their boundaries, courses, and extent, and whether they be for streets, alleys, commons, or other public uses, and all the lots intended for sale, by progressive numbers, and their pre-

72 MICH. 17.

cise length and width; and the maps made and acknowledged before a justice of the peace, a notary public of the proper county where the town lies, or before any judge of any court of record, and certified under the hand and seal of the judge, justice, or notary public taking such acknowledgment, and recorded, should be deemed a sufficient conveyance to vest such parcels of land therein expressed, named, or intended to be for public uses, in the county in which such town lay, in trust to and for the purposes therein named, expressed, or intended, and for no other use or purpose whatever.

The acknowledgment was taken before a justice of the peace. But it is not certified under his seal; nor are the public grounds, streets, or alleys set forth and described by their boundaries, courses, and extent; nor is the precise width of the streets, or the width and length of any of the lots, marked upon the map, or anywhere stated or described; nor is the particular land platted anywhere stated or described. There is a scale of feet in the margin, indicating an horizontal distance of 50, 100, 200, 300, and 400 feet, and divided perpendicularly into 10, 20, 30, 40, and 50 feet. This scale is too imperfect to determine the width of the streets and lots upon the plat. The horizontal distance of 50 feet does not correspond with the distance of 50 feet designated upon the perpendicular scale. There is no known boundary or monument given as a base line or starting point of the survey. All that can be said of it is that it is a mere plat upon paper, and in no sense a compliance with the statute, and was not such a map or plat as, when recorded, vested the fee in the county, or effected a dedication of the streets to the public use.

The answer of defendants admits that Paul had no title, and they do not claim that he ever made any dedi-

cation at all. But they claim that the dedication of the streets for public use came from the United States; that the title was in the United States, and, under the act of Congress referred to, the occupants of the lots under the survey and plat of James K. Paul acquired certain ease-ments, rights, and interests in the streets and alleys which had been laid out and used adjacent to the lots so occupied; that the act of Congress was for the very pur-pose of enabling the occupants of lots so situated to become the owners of the land they so occupied, accord-ing to their respective interests; that disposing of the lands covered by a town to the occupants could not be done, except that the streets and alleys therein for public use were reserved to the public; that the provision for sale by the district judge in the law of 1861 not only expressly recognized the plat, but recognized the fact that the streets and alleys on that plat did not belong to the trustee, having already passed by dedication from the United States to the public; that the land covered by the town-site as platted was conveyed by the United States to the trustee, for the use and benefit of the occupants thereof, and this was a recognition of the fact that there was already an existing village thereon.

The argument is good so far as the rights and interests of occupants of the town-site are concerned. The object of the legislation, National and State, was to protect the rights of actual occupants, and it does so fully by ex-tending to them the principles which have been so often applied for a like purpose when a proprietor of land has platted it into a town-site, but not so as to effect a legal dedication, and sold land to individuals in accordance with the plat.

As between individuals so purchasing and the proprie-tor, they are entitled to have the streets necessary or convenient for their use and enjoyment of the property

purchased by them kept open for their own and the
public's use. But such proprietor is not estopped from
reclaiming or shutting up any street or portion thereof
delineated on his plat, where private rights are not di-
rectly affected; and as against the municipality claiming
the streets, where the public have not acquired rights by
user, or acceptance of the offer to dedicate, indicated by
the platting, the owner is not estopped. He may revoke
or recall his offer to dedicate before actual acceptance at
any time, when the plat has not been executed in accord-
ance with the statute, and placed upon record. *City of
Galveston v. Williams,* 69 Tex. 449 (6 S. W. Rep. 860);
*People v. Beaubien,* 2 Doug. 256; *People v. Jones,* 6 Mich.
176; *Baker v. Johnston,* 21 Id. 319; *Detroit v. Railroad
Co.,* 23 Id. 173, 209; *County of Wayne v. Miller,* 31 Id.
447; *Board of Supervisors v. Banks,* 44 Id. 467 (7 N. W.
Rep. 49); *Buskirk v. Strickland,* 47 Id. 389 (11 N. W.
Rep. 210).

The position assumed, that the United States, by grant-
ing a patent to Judge Goodwin, as trustee, in trust,
thereby dedicated the land platted as streets to the pub-
lic use, is too broad. The implication from the grant is
that the land embraced in the patent to Goodwin had
been settled upon and occupied as a town-site, and the
grant was made to Judge Goodwin in trust for the several
use and benefit of the occupants thereof, according to their
respective interests. Nothing is said in the law or in the
patent of any plat of a town-site. No law of Congress
or of this State at that time authorized such platting.
The land which the act of Congress contemplated might
be settled upon and occupied as a town-site was land which
belonged to the United States, and was not subject to
private entry or private sale. It contemplated that settlers
and others had, to use a well-known expression, "squatted"
upon it, and staked out or fenced in their respective lots.

Mr. Justice MANNING, in the case cited from 6 Mich., called attention to the fact that the act of Congress referred to was vague and indefinite in most of its provisions, and especially to the word "lot," as used in the act, and said that its use would seem to imply a previous platting or laying out of a town; that is, as I conceive the learned Justice to have meant, before the land was "disposed" of; and he clearly intimates that the Legislature should provide for such platting in order to carry out the intent of Congress, and apply the language of the act to the subject-matter. This necessarily must be so; for, as before observed, until such legislation by the State Legislature, there existed no authority for any one to plat the public domain into lots for a town-site.

He says, at page 215:

"I think the rules and regulations to be made by the local legislature are to have reference to the settlement of such questions, as well as to the disposition of the part of the town not actually occupied for town purposes by individuals. Shall the part not occupied be platted into lots, and be sold? Shall any of it be reserved for public buildings? For what public purpose shall the proceeds of the sale be appropriated? These and the like questions are to be answered by local legislation."

I think that Congress intended that as to unoccupied lots the Legislature might authorize the trustee to make a survey and plat, and dedicate the streets and public grounds to the public use, or it might authorize a sale in such parcels as they should deem the situation of the town, its probable future, and its circumstances should require. I think, also, that the word "lot" in the act of Congress applied equally to the land actually occupied by the residents of the town-site. One of the ordinary meanings of the word given by lexicographers is—

"That portion of ground which is allotted or assigned to any one, and hence a distinct portion of land."

In making regulations for the disposition of the lots it might be that there would be more than one claimant, or the occupant might not establish his right, and in such case I think it would be competent for the Legislature to authorize the sale or other disposition of such lot, as also it might do if an occupant neglected or refused to pay his just proportion of the expense of entering the land. It is true, the Legislature has mentioned the fact that the lands held in trust by Judge Goodwin had—

"Been surveyed and laid out into town lots and blocks, and are known as the Village of Ontonagon, and additions thereto."

This mention, however, occurs in a recital, and does not expressly adopt or ratify such survey or plat, if, indeed, it would be competent for them to do so. The legal title had passed from the United States to the trustee; and he would be the only competent person to dedicate the land to public uses.

In the case of *Hamilton v. Railroad Co.*, 124 Ill. 235 (15 N. E. Rep. 854), the court passed upon the effect of a statute recognition of a plat. The acts relied on as showing an acceptance were:

1. The proceedings of the common council of Chicago in 1854, adopting an ordinance for "planking Blue Island avenue," and the assessment to pay for this improvement.

2. The fact that from 1851 the property was assessed for taxation under the description of lots and blocks.

3. An act of the legislature in 1865, entitled "An act to authorize the dedication, resubdivision, and partition of Canalport, in Cook county," and an amendatory act in 1869, conferring like powers on the superior court of Chicago.

With reference to the third point the court said:

"The act of the legislature of 1865, which is referred to as an acceptance of the dedication, provides that the

proprietors of a majority in numbers of the lots in Canalport may file a petition in the circuit court in chancery, making the other proprietors parties, and authorizes the court, on such petition and notice to the other proprietors, to appoint commissioners, etc., and enter a decree vacating the subdivision, and replatting and partitioning the property among the several proprietors. This act recognizes the existence of the plat of the subdivisions that there were private rights in respect thereto, and provides for a partition among the lot-owners. But we are unable to perceive that in this there was any recognition that there had been an acceptance by the public of the dedication of the streets. There might well have been private rights in respect to streets in grantees of conveyances made under the plat, although there may have been no complete dedication of the streets to the public by an acceptance of the proffered dedication, as we have before suggested. The above are the facts which are relied upon as showing an acceptance. We find them to be insufficient, and that there was no acceptance by the public of the dedication of the streets."

The same reasoning applies to the case before us. As before observed, the main object of the legislation was to protect private rights. There is no intent apparent that the Legislature intended to accept the dedication of the Paul plat.

Proof of the acceptance of the land dedicated by its owner to the public use must be unequivocal and convincing. Such acceptance imposes duties upon the municipality which are onerous, and greatly increases its liability for injuries occasioned for the non-repair of streets. In this particular instance the burden would be peculiarly onerous. There are nine streets projected across this arm of the river or "slough," as it is called, thus imposing upon the village the duty of building nine bridges, and keeping them in repair and safe for the public travel. The streets across the island are of no sort of use unless connected with the main-land by some sort of viaduct. This is accomplished in the winter season,

as to those streets more remote from the lake by the formation of ice, but the public have the right to the use of the streets for travel, and especially would the owners of property adjoining the streets on the island, both in winter and summer. I do not think from the testimony either that a dedication or an acceptance thereof, if one could be said to have been made, has been shown.

There is another very important question affecting the right to assert any claim under the act of Congress, and that is the point raised by Mr. Justice CAMPBELL *In re Selby,* 6 Mich. 208, above referred to. He said:

"But the law did not authorize the judge to enter any subdivision not settled upon and occupied as a town; and if this was not thus occupied, it was not withdrawn from private pre-emption."

This island by the government survey was returned by the surveyor general as a separate lot or subdivision. I do not find any testimony showing that this island was occupied as a town-site at the time Judge Goodwin entered it as such. The question is not raised by the pleadings, and it is not necessary to pass upon it here. Neither do I think it is necessary to pass upon complainant's title, which was based in part upon tax deeds. It shows itself in possession, claiming title; and as against an intruder who threatens to enter and dispossess it for the purposes of a public street or highway, I think it shows a right to equitable relief by injunction.

The circuit court decreed that complainant had an indefeasible title to the lots adjoining, and to Copper street where it crosses the island. The decree of the circuit court will be modified by omitting that portion referring to complainant's title, and reciting that it is threatened to be disturbed in its possession of the land

called "Copper Street," where it crosses the island. The balance of the decree will be affirmed, with costs.

The other Justices concurred.