STICKLEY *v.* TOWNSHIP OF SODUS.

1. HIGHWAYS—PRIVATE ROADS—PERMISSIVE USE BY PUBLIC.
     A mere permissive use of a private road by the general public, however long continued, will not make it a public highway.

2. SAME—USER—WHEN SUFFICIENT.
     To constitute a highway by user under the statute (2 Comp. Laws, § 4061, providing that all roads that have been used as such for 10 years or more shall be deemed public highways), such use must have been accompanied by some act on the part of the township authorities so open, notorious, and hostile as to be notice to the landowner that his title was denied.

3. SAME.
     A road opened and maintained by a landowner for his own use and profit, leading from a highway to a private ferry over a navigable stream, operated under authority from the board of supervisors, which road was used by all persons having occasion to travel over it for more than 30 years, but was never dedicated to the public, nor treated as a highway by the township authorities, did not, by such user, become a public highway, so as to charge the township with the duty to keep it in repair.

Error to Berrien; Coolidge, J. Submitted April 24, 1902. (Docket No. 137.) Decided October 7, 1902.

Case by Lucy Stickley against the township of Sodus for personal injuries. From a judgment for plaintiff, defendant brings error. Reversed.

Plaintiff was driving with a horse and buggy down a roadway leading from the top of the bluff along the east bank of the St. Joseph river, in the defendant township, to what is known as "King's Landing." The bank is high and steep. She was precipitated over the bank and injured. The negligence alleged is the failure to erect suitable barriers along the side of the road. The principal defense is that the road is not a public highway, but a private road, and that the defendant was under no obligation to keep it in repair. The sole question presented for determination is, Was this road a public highway? If it was, defendant is liable; if it was not, the defendant is not liable.

It is conceded that the owners of the land never dedicated this road to the public for a highway; that no proceedings were ever instituted to lay it out as a highway; that it was originally a private road; and that the township authorities never exercised any control over it, and never accepted it as a public highway, unless the use of it by travelers without objection amounted to such control and acceptance. Plaintiff bases her right to recover entirely upon the theory that this road has become a public highway by user alone, under the statute (2 Comp. Laws, § 4061), which reads:

"All highways regularly established in pursuance of existing laws, all roads that shall have been used as such for ten years or more, whether any record or other proof exists that they were ever established as highways or not, * * * shall be deemed public highways."

The facts are not in doubt. The townships of Sodus and Royalton, in Berrien county, constitute town 5 S., range 18 W. The St. Joseph river, a crooked, navigable stream, divides township 5, range 18, into about two equal parts; one being Sodus, the other Royalton. On the Royalton side of the St. Joseph river, near where this injury occurred, the land is bottom land, and but little higher than the bed of the river. On the Sodus side the land is many feet above the river bed, and in the vicinity where

the accident occurred it is about 55 feet higher. On account of the bluffs on the east side of the river, there has never been a bridge erected across the river between the city of St. Joseph and Berrien Springs, a distance by water of 25 miles, until within the last three or four years, when a railroad and carriage bridge was built by the railroad company at Somerleyton, a few miles to the north and west of the place where this injury happened.

St. Joseph river has always been navigable for flat-bottomed boats, scows, rafts, and the like. In the early days of the county, between 1850 and 1870, when lands were being cleared in Sodus and vicinity, it was necessary that logs, wood, and other forest products be put into the river and floated down to St. Joseph, at the mouth of the river. Sawmills were built in Sodus township, and lumber manufactured, and transported down the river on rafts, boats, and scows.

The township authorities of Sodus township never laid out and established any highway running down to the river. They had laid out and established certain highways running east and west and north and south, and had laid out and established a highway running in a northerly and southerly direction near the bluff of the river, which is called in these proceedings the "River Road." In some places this River road is quite close to the bluff of the river; in other places quite a distance away from the river. The township had also, among other roads, laid out and established a road on the section line between sections 10, 11, and 12 on the north and 15, 14, and 13 on the south. This road is called in these proceedings the "Sodus Road," and extends no farther west than the River road.

Some time between 1850 and 1860 one Golden owned the land upon which the roadway in question is now situate. Owners of land along the river at that time received pay for banking forest products upon their land. Golden, seeing that he had a better place than some of his neighbors, commenced to build this road for his own gain. About 1865 Golden sold the land, including this roadway,

to one Versaw, who continued to own it until about 1885, when he sold to one Gunther. It is now owned by several parties. Versaw, after he became the owner, completed the road. A roadway of some kind had existed there for at least 35 years before the injury. It was also conceded that the records of the township do not say anything at all about this roadway, and fail to disclose any action by the authorities concerning it. It commenced at the intersection of the Sodus and River roads, and terminated at the ferry beyond the Graham landing, and is about 900 feet in length. Its narrowest width is 7 feet, its greatest width 14 feet. The left side of the road, in going down the bluff, is principally clay. At the foot of the hill there is about a quarter of an acre of nearly level area. A shanty or boat dock is here operated by Graham. A small steamboat, called the "May Graham," lands there. Beyond the shanty is the ferry dock. Both docks and the ferry are private property. There has never been a railing or barrier of any kind along this roadway. At the place where plaintiff went over the embankment, the roadway was wider than at any other portion, and the distance from the roadway at that point to the river was from 25 to 30 feet.

On the Royalton side of the river a highway was laid out on the section line between sections 9 and 16, running to the river itself. If this was ever established by the authorities, it would appear that the last quarter of a mile of it was never in fact used by any one. The record discloses that this section-line highway was properly established and worked until it reaches the 35-acre tract now owned by Frank Steimle, and that it there stops. Forty or more years ago one Polly Wood owned the Steimle place, and had logs and forest products banked on her place, for which she made a charge. Her dock or landing was called "Polly Wood's Landing," and is directly opposite the so-called "King's Landing." In order to get to her landing people drove over her land from the public highway. No town work was ever done on the roadway running through her land to the river. Frank

Steimle bought her place about 27 years ago, and the road-way through his land still exists as it did when Polly Wood owned it.   No public work has been done on that roadway since Steimle owned the land.   Many years before a ferry was put in there, people having milling to do used this Polly Wood roadway to get to the river, and then in the summer-time took their grain across the river in boats, and had it carted up the King's Landing road, or, in the winter time, crossed on the ice.

About 24 years ago one Deaner put in a ferry connecting the Steimle or Polly Wood's landing and King's landing. This ferry was operated one or two years.   At the time Deaner operated this ferry, a part of the roadway in question slid down, and Deaner fixed it at his own expense. About 22 years ago Steimle began operating a ferry between these two landings.   In 1892 he petitioned the board of supervisors for a license to operate a ferry across the river at this point.   It was granted upon condition that he "construct and maintain all roads and approaches to said ferry at his own expense."   Steimle, a witness for plaintiff, testified as follows:

" The reason I worked on the King's Landing road was because of this license, and also to keep the road straight, so teams could go up and down, and I could make more money with my ferry."

The owners of the land across which this road runs, and those who used it, did all the work that was ever done upon it, except a trifling amount which the overseer of highways did in 1897 or 1898 and 1899,—two or three years before this suit was commenced.   This is so trifling and so recent that the learned counsel for plaintiff do not mention it in their brief, and evidently do not consider it of any importance.   Neither do we.

Plaintiff recovered verdict and judgment.

*Lawrence C. Fyfe* and *O'Hara & O'Hara*, for appellant.

*Gore & Harvey*, for appellee.

GRANT, J. (*after stating the facts*).   Plaintiff claims that this private road has been converted into a public highway.   She bases her claim solely upon the statute above cited, and insists that user alone by those having occasion to travel over it is sufficient to convert it into a public highway.   The question, therefore, is, Under what circumstances does a private road become a public highway by user, as provided by the statute?   This road was originally built for private gain, over private grounds, and to a private dock and ferry.   The record is absolutely barren of any testimony tending to show that the original owners of the land and the builders of this road intended to make it a public highway.   At what period and by what acts was its private character changed into a public one?   It is true that for nearly 35 years every one who had occasion to pass that way walked or drove over it without objection from the owners of the land.   Not only that, but those who built it and their successors invited every member of the public to use it, for every member of the public paid them for the use of the dock and ferry at its terminus.   It is also true that, for the same length of time, the township authorities took no action, either in writing or by act, to indicate that the township ever intended to establish or accept this road as a highway, or that they considered the township liable in any way for its condition, or that they were under any obligation to keep it in repair.   Its use by the public has been no other or different during the past 30 years than it was the first year after its construction.   There has been no change in the character of the travel.   The relations between the owners and the public have never changed.   Neither has done anything to indicate to the other that they understood that its original character had been changed.   The learned counsel for plaintiff seem to be of the opinion that, when one opens a private road, it becomes his duty to put up some notice to show that it is not a public, but a private, way.   They say in their brief:

"The record does not show that the owners of the land over which the road passed ever did a thing to show that they considered it other than a public highway. No one who desired to use it was ever turned back, or his right to use it questioned. It was used as uninterruptedly by the public as Woodward avenue, in Detroit."

It would certainly be a strange rule which would require the original constructors of this road to turn people back, or question the right of any traveler to use it, when the traveler was invited to use it, and its use required the payment of toll at the dock or ferry at its terminus. The above statement made by counsel is undoubtedly true, for, the greater the travel, the more money for the owners of the dock and ferry. A private way is just as much open for use by those who have occasion to use it as is a public way. If Woodward avenue, in Detroit, which extends to the water line of the river, and was so established originally, had been laid out and constructed to within only 200 feet of the river, and the owner of the land between the foot of the street and the river had opened it for his own dockage and ferry purposes, had paved it, kept it in repair, and had not only permitted but invited the public to pass over it for ferriage to Windsor, Belle Isle Park, and other places upon the river, would such use for 10 or 100 years make it a public highway, take exceedingly valuable property from the owner for a public use, and impose heavy burdens upon the city of Detroit for neglect to keep it in repair? If this be so, then every owner of land along the river front in the city of Detroit and elsewhere, who builds a private dock or establishes a ferry, and opens a road from the public highway to such dock or ferry, loses the title to his land by such use. No case cited maintains such a doctrine. The defendant township had constructed and maintained the River road and the Sodus road for the public use. There is nothing to indicate that its public authorities ever intended to adopt this road along the side of this steep bank as a part of its system of highways.

A farmer may open a private road from one public high-

way to another across his farm, which will accommodate not only himself, but all who choose to travel that way. His permission to the general public to travel that way is not an act hostile to his title, or to his right to close the road at any time. So a manufacturer may establish his plant in the center of his lands, and open a road to the public highway upon either side, and permit the public to use it, and merchants and peddlers to travel it, carrying their goods for sale to the houses owned by him and occupied by his employés and tenants. But such use is permissive, and gives the public no permanent rights in it as a highway. So a mining corporation, as is often the case, constructs roads from the public highways in, over, and around its mine, built and kept in repair by the company, and permits the public the free use of them. But this does not make them public highways within the meaning of the statute. Such permissive or invited use is not that use contemplated by the statute which will convert a private road into a public highway. The use required by the statute is one accompanied by some act on the part of the township authorities open, notorious, and hostile to the private ownership; some act which gives the original owner notice that his title is denied. *Alton* v. *Meeuwenberg*, 108 Mich. 629 (66 N. W. 571); *Diamond Match Co.* v. *Village of Ontonagon*, 72 Mich. 249 (40 N. W. 448). Mr. Elliott says:

"It must appear that the owner fully consented to the change, or there must be some element of estoppel to deprive him of his rights as the owner of the fee. Where a way is laid out and used as a private way, the mere fact that the public also makes use of it without objection from the owner will not make it a public way." Elliott, Roads & S. § 5.

This doctrine applies with special force to those roads built in a new country, and for such purposes as was the road in question. The mere use, however long, is not sufficient to effect a change. *District of Columbia* v. *Robinson*, 180 U. S. 92 (21 Sup. Ct. 283); *Lewis* v. *City of*

*Lincoln*, 55 Neb. 3 (75 N. W. 155); *Speir* v. *Town of New Utrecht*, 121 N. Y. 429 (24 N. E. 692); *Lewis* v. *Railroad Co.*, 123 N. Y. 502 (26 N. E. 357); *Downend* v. *Kansas City*, 156 Mo. 60 (56 S. W. 902, 51 L. R. A. 170); *Stewart* v. *Frink*, 94 N. C. 487 (55 Am. Rep. 619); *Root* v. *Com.*, 98 Pa. St. 170 (42 Am. Rep. 614).

In *Speir* v. *Town of New Utrecht* it is said:

"The mere fact that a portion of the public travel over a road for 20 years cannot make it a highway, and the burden of making highways and sustaining bridges cannot be imposed upon the public in that way. There must be more. The user must be like that of highways generally. The road must not only be traveled upon, but it must be kept in repair or taken in charge and adopted by the public authorities. * * * A private way, opened by the owners of the land through which it passes for their own uses, does not become a public highway merely because the public are also permitted for many years to travel over it."

In *Stewart* v. *Frink* it is said:

"It would be unjust, as well as ungracious, to take advantage of his [the landowner's] generous permission to use his land for public convenience, and the law will not allow this to be done."

This statute was not passed with the view to convert private roads into public ways. It was designed to remedy defects in establishing and recording highways. *Green* v. *Belitz*, 34 Mich. 512.

Among the cases cited by counsel for plaintiff as conclusive of their position is *Ellsworth* v. *City of Grand Rapids*, 27 Mich. 250. That case well illustrates the purpose of this statute and its necessity. The road there in dispute was originally laid out by the commissioner of highways, but there was a mistake in the survey or in recording it. It formed one of the principal thoroughfares in and out of the city of Grand Rapids. Immediately after it was laid out, it was worked by the city authorities, and continued to be worked and maintained solely by them. The language relied upon in that case has no

application to a case like the one now before us. In all the cases cited, the municipal authorities had taken some action hostile to the claim of the landowner that it was a private road, and by failing to assert his rights he was estopped after 10 years from setting them up.

The action of the board of supervisors in establishing a ferry has no significance. It does not even tend to show that the supervisors considered the road a public one. But, even if they did, they could not bind the township. The river was navigable, and, under the statute, the board of supervisors had control over bridges and ferries across it, and, under the police power, were authorized to license private ferries and establish requirements for their management.

The judgment is reversed, and a new trial ordered.

HOOKER, C. J., MOORE and MONTGOMERY, JJ., concurred.